**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

GREGOIRE TOURNANT,

Defendant.

22 Cr. 276 (LTS)

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT GREGOIRE TOURNANT'S MOTION TO DISMISS THE INDICTMENT, OR, IN THE ALTERNATIVE, FOR A HEARING**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ............................................................................................................. 4

   A.  Mr. Tournant Personally Engages Sullivan & Cromwell LLP and Ropes & Gray LLP to Represent Him Jointly with Allianz................................................................................ 5

   B.  The Firms Initially Deny Wrongdoing by Allianz and Mr. Tournant ............................... 8

   C.  A Structured Alpha Fund Employee's SEC Testimony Alters the Landscape.................. 8

   D.  The Government's Investigations Presented an Existential Threat to Allianz's Worldwide Businesses .................................................................................................................. 10

   E.  The Firms Misuse Their Attorney-Client Relationship with Mr. Tournant to Obtain Evidence Against Him for Allianz's Benefit .................................................................. 11

   F.  S&C Scapegoats Mr. Tournant to Save Allianz ........................................................... 13

      1.  S&C Investigates and Crafts the Government's Case Against Mr. Tournant Regarding Alleged Alterations ............................................................................................... 17

      2.  S&C Investigates and Crafts the Government's Case Against Mr. Tournant Regarding Alleged Obstruction of Justice ............................................................................... 18

   G.  The Government Knew About Mr. Tournant's Attorney-Client Relationship with the Firms ........................................................................................................................ 20

   H.  S&C and Allianz Are Rewarded For Their Cooperation Against Mr. Tournant ............. 22

THE COURT SHOULD DISMISS THE INDICTMENT OR HOLD A HEARING TO DETERMINE WHETHER THE INDICTMENT SHOULD BE DISMISSED .......................... 24

   I.  THE INDICTMENT SHOULD BE DISMISSED BECAUSE MR. TOURNANT'S FORMER LAWYERS SWITCHED SIDES AND JOINED IN HIS CRIMINAL PROSECUTION ............................................................................................................ 25

      A.  The Government Collaborated with S&C in its Prosecution of its Former Client, Mr. Tournant ............................................................................................................ 26

      B.  S&C's Conduct in Betraying Mr. Tournant and His Attorney-Client Relationship Is Attributable to the Government .................................................................................. 28

         1.  S&C's Acts Are Attributable to the Government Because the Principles Induced S&C to Switch Sides and Betray Mr. Tournant.................................................................. 28

            a.  The All-or-Nothing Approach to Cooperation Credit Induced S&C and Allianz to Scapegoat Mr. Tournant................................................................... 30

            b.  The Principles Induced S&C to Structure Mr. Tournant's Engagement Letter to Give It Cover in the Event It Decided to Turn on Its Former Client ......... 32

         2.  The Government Knew that the Firms Personally Represented Mr. Tournant .... 35

II.  ALTERNATIVELY, THE COURT SHOULD HOLD A HEARING TO DETERMINE
WHETHER THE INDICTMENT SHOULD BE DISMISSED ...................................... 36

   A.  Absent Dismissal, a Hearing Is Necessary to Determine the Extent of the
   Government's Responsibility for S&C's Conduct ....................................................... 37

   B.  Absent Dismissal, a Hearing Is Necessary to Determine the Extent to Which the
   Government's Access to Mr. Tournant's Privileged Statements to S&C Tainted the
   Indictment and Prosecution Team .............................................................................. 38

       1.  Mr. Tournant Holds the Privilege Over His Confidential Communications With
       S&C ............................................................................................................................ 40

       2.  Mr. Tournant's Privileged Communications Were Shared With the Government
       and Used in the Indictment .................................................................................... 43

   C.  Full Discovery Should Be Provided in Advance of a *Kastigar* Hearing ................... 44

CONCLUSION ........................................................................................................................ 45

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Baird v. Koerner*,
   279 F.2d 623 (9th Cir. 1960) ...................................................................... 41

*Cinema 5, Ltd. v. Cinerama, Inc.*,
   528 F.2d 1384 (2d Cir. 1976) ..................................................................... 33

*Felix v. Balkin*,
   49 F. Supp. 2d 260 (S.D.N.Y. 1999) .......................................................... 33

*First NBC Bank v. Murex, LLC*,
   259 F. Supp. 3d 38 (S.D.N.Y. 2017) .......................................................... 33

*Flagg v. Yonkers Sav. & Loan Ass'n*,
   396 F.3d 178 (2d Cir. 2005) ....................................................................... 29

*Jackson v. Metro. Edison Co.*,
   419 U.S. 345 (1974) .................................................................................... 29

*Kastigar v. United States*,
   406 U.S. 441 (1972) ............................................................................. Passim

*United States v. Allen*,
   864 F.3d 63 (2d Cir. 2017) .................................................................... 38, 39

*United States v. Connolly*,
   2018 WL 2411216 (S.D.N.Y. May 15, 2018) ............................................. 37

*United States v. Connolly*,
   2019 WL 2120523 (S.D.N.Y. May 2, 2019) ............................................... 38

*United States v. Gartner*,
   518 F.2d 633 (2d Cir. 1975) .................................................................... 3, 25

*United States v. Helmsley*,
   726 F. Supp. 929 (S.D.N.Y. 1989) ............................................................. 39

*United States v. Hoey*,
   2016 WL 270871 (S.D.N.Y. Jan. 21, 2016) ............................................... 39

*United States v. Landji*,
   2021 WL 5402288 (S.D.N.Y. Nov. 18, 2021) ............................... 24, 25, 38, 39

*United States v. Mejia*,
   655 F.3d 126 (2d Cir. 2011) ................................................................ 40

*United States v. North*,
   910 F.2d 843 (D.C. Cir. 1990)......................................................... 39, 40

*United States v. North*,
   920 F.2d 940 (D.C. Cir. 1990)............................................................. 39

*United States v. Rosner*,
   485 F.2d 1213 (2d Cir. 1973) ............................................................. 25

*United States v. Sabri*,
   973 F. Supp. 134 (W.D.N.Y. 1996)..................................................... 25

*United States v. Schell*,
   775 F.2d 559 (4th Cir. 1985) ................................................. 25, 27, 36

*United States v. Schwimmer*,
   892 F.2d 237 (2d Cir. 1989) ............................................................... 38

*United States v. Schwimmer*,
   924 F.2d 443 (2d Cir. 1991) ............................................. 3, 24, 25, 39

*United States v. Stein*,
   541 F.3d 130 (2d Cir. 2008) .......................................................Passim

*Upjohn v. United States*,
   449 U.S. 383 (1981) ............................................................................ 6

## **Other Authorities**

N.Y.C. Bar Formal Op. 2004-02 (2004) ...................................................... 43

N.Y.C. Bar Formal Op. 2016-2 (2016) ....................................................... 43

New York Rule of Professional Conduct 1.9...................................................... 43

New York Rule of Professional Conduct 1.7...........................................Passim

N.Y.S. Bar Association Ethics Op. 823 (2008) .......................................... 43

SEC Enforcement Manual Section 3.3.5.3 ..................................................... 6

## PRELIMINARY STATEMENT

> **"Sitting here where I am would like to see you prosecute GT [Mr. Tournant] – would like to help you do that but may not have anyone at AGI US to help you do that if guilty plea."**

> - Excerpt from the Government's Notes of a March 1, 2022 Statement of Mr. Tournant's Former Personal Counsel to the United States Attorney

In early June 2021, defendant Gregoire Tournant met with his lawyers to prepare for his impending testimony before the Securities and Exchange Commission ("SEC") in connection with the very matters that led to the present Indictment. The lawyers at one of the firms representing him would later reveal every word of Mr. Tournant's answers to their increasingly probing questions to the United States Attorney's Office for the Southern District of New York (the "USAO" and, collectively with the SEC, the "Government"). The law firm knew before that meeting (but did not raise and resolve with Mr. Tournant) that a conflict of interest had developed that made it impossible for it to continue to represent his interests as well as those of its other client, Allianz. That law firm would go on to switch sides and act, in its own words, as the "back office" to the USAO in the investigation of Mr. Tournant, all for the benefit of Allianz, which found itself in a life-or-death situation brought on by the investigations and the Government's onerous corporate cooperation policy. Counsel's actions, in dereliction of their professional obligations and engagement agreement with Mr. Tournant, are the direct result of the Government's overwhelming influence such that the Government bears responsibility for them. As demonstrated in this motion, the Court should dismiss the Indictment on the current limited record or, alternatively, hold a hearing, after pre-hearing discovery, at the time it previously set aside on March 28-29, 2023, to determine the full scope of the Government's interactions with Mr. Tournant's former attorneys and the extent to which the Indictment and the Government's trial

team and agents have been tainted through the Government's improper exposure to Mr. Tournant's privileged communications.

The Indictment stems from a joint investigation by the USAO and SEC into a series of private investment funds managed by Allianz Global Investors U.S. LLC ("AGI") that suffered substantial losses during the market displacement that resulted from the COVID-19 global pandemic.  (ECF No. 2.)  AGI and its parent entity Allianz SE (together with the AGI and Allianz SE's other subsidiaries, "Allianz") retained two prominent law firms to represent Allianz in connection with the investigation and related civil lawsuits.  Although not required, Allianz also made the strategic decision to allow those two law firms to represent Mr. Tournant (and other Allianz employees) personally in connection with the matters.

These attorneys, however, ultimately concluded that the Government's investigation presented an existential threat to Allianz—to use counsel's words, Allianz was facing the "corporate death penalty."  In an effort to stave off a possible indictment against Allianz, counsel made the choice to misuse their attorney-client relationship with Mr. Tournant to obtain additional statements from him about the subject matter of this case, which they subsequently disclosed to the Government.  They then advocated for the Government to prosecute Mr. Tournant in lieu of prosecuting Allianz.  Unfortunately for Mr. Tournant, counsel's gambit worked.  The Government adopted the narrative—which will ultimately be shown to have been wildly misleading, though it is not at issue on this motion—that counsel presented as to Mr. Tournant, and Allianz obtained a favorable plea deal in which Allianz SE completely avoided indictment and AGI agreed to plead guilty to only one count of securities fraud.

In light of the Government's knowledge of Mr. Tournant's former attorneys' betrayal, the USAO should have thrown them out of its office when they first disclosed Mr. Tournant's client

confidences and advocated for his indictment.  But it did no such thing; rather, it encouraged counsel to provide more and more information concerning their former client, including verbatim readings from counsel's notes of their privileged communications with Mr. Tournant.  The attorneys' betrayal was a direct result of the Government's onerous policies pertaining to the charging of business entities.  These policies condition cooperation credit—which Allianz and its attorneys deemed essential to avoid the "fatal" result of a guilty plea—on a company's willingness to build the Government's case against employees.  As applied here, these policies left Allianz in the desperate position of needing to scapegoat Mr. Tournant in an attempt to avoid indictment, and they coerced Mr. Tournant's former counsel to turn on one client in order to save another.

At its core, the American adversary system is based on the premise that justice can be secured only where each litigant has a champion—an attorney committed to zealously advocating on that litigant's behalf based on the unique attorney-client relationship.  This motion is based on the misconduct of prosecutors who deprived Mr. Tournant of this most basic right in inducing his former counsel's betrayal and disclosure of client confidences.  The Court should dismiss the Indictment on the current record because the Government's intrusion into Mr. Tournant's attorney-client relationship in this case was "manifestly and avowedly corrupt."  *United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991) (quoting *United States v. Gartner*, 518 F.2d 633, 637 (2d Cir. 1975)).  Alternatively, absent dismissal, the Court should hold a hearing, following pre-hearing discovery, to determine the full scope of the Government's interactions with Mr. Tournant's former attorneys and the extent of the taint resulting from the Government's improper exposure to Mr. Tournant's privileged communications.

## BACKGROUND

As alleged in the Indictment, the Structured Alpha funds (the "Structured Alpha Funds" or "Funds") were a series of private investment funds commonly managed by AGI. (ECF No. 2 ¶ 11.) The Funds' investors were some of the largest and most sophisticated institutional investors worldwide. Although some of the Funds had bespoke investment strategies tailored to a specific institutional investor's needs, the Funds all generally followed a similar options-based strategy. (*Id.* ¶ 16.) This strategy had two components: the "beta" component, which delivered a return to investors equivalent to a specified benchmark index, such as the S&P 500 Index; and the "alpha" component, which involved a complex options strategy designed to deliver additional returns, regardless of the benchmark index's performance. (*Id.* ¶ 17.) Mr. Tournant created the Structured Alpha Fund strategy, and, for more than a decade, he led the portfolio management team at AGI that successfully managed the Funds, including through market volatility and multiple market dislocation events like 2008's "Great Recession." (*See id.* ¶ 14.) The Funds performed well, and at their height, held over $11 billion in assets under management. (*Id.* ¶ 10.) Overall, the Funds were some of the most profitable funds managed by AGI and contributed to more than a quarter of AGI's profits in recent years. (*Id.*)

Then, in early March 2020, Mr. Tournant became ███████████████████████ ████████████████████████████████████████████████████████████████ ███████████ While Mr. Tournant was out ███████████████, the market experienced a historic downturn following the onset of the COVID-19 pandemic. The Funds' hedging positions were designed to protect against an overnight or short-term equity-market crash (*id.* ¶ 17), but not the unique multi-week market volatility of the COVID market crash. In addition, the Structured Alpha Funds' losses were amplified by certain AGI investment decisions made in Mr. Tournant's

absence.  Ultimately, the Funds lost more than $7 billion in market value, including more than $3.2 billion in lost principal.  (*Id*. ¶ 7.)

In the wake of the COVID crash and the Funds' subsequent losses, the SEC opened an investigation, which was later joined by the USAO.  In addition, many of the Funds' institutional investors filed more than 20 separate civil lawsuits against AGI that were consolidated in this District, and later settled during fact discovery.  *See In re AllianzGI Structured Alpha Class Action Litig.*, 20 Civ. 7154 (KPF) (S.D.N.Y. 2020).

Despite the fact that he was on leave during the COVID market crash that resulted in the losses at issue, the USAO unjustly indicted Mr. Tournant, alleging that he was criminally responsible for the Funds' losses.  The Indictment includes allegations concerning past representations and disclosures relating to hedging and other risk-management strategies, as well as data and reports provided to a discrete number of institutional investors.  It gives the false and misleading impression that the losses were somehow related to AGI's representations and risk disclosures, as opposed to the unique, COVID-related market volatility and the mismanagement of the Funds in Mr. Tournant's absence.  In any event, those representations and disclosures were immaterial and not reflective of criminal activity.  Indeed, lost in the Indictment's sinister cast is the fact that there is no allegation that all official valuations of the Funds, and the subsequent fees charged to all investors based on those valuations, were anything but accurate.

A.    **Mr. Tournant Personally Engages Sullivan & Cromwell LLP and Ropes & Gray LLP to Represent Him Jointly with Allianz**

Allianz retained Sullivan & Cromwell LLP ("S&C") and Ropes & Gray LLP ("Ropes" and, together with S&C, the "Firms") to represent it in connection with the SEC investigation, any future governmental investigations, and the civil lawsuits.  (*See* Declaration of Seth L. Levine,

dated Dec. 23, 2022 ("Levine Decl."), Ex. A at 1; Ex. B at 1.)  From the outset, Allianz made substantial document productions to the SEC and cooperated with the investigation.

In October and November 2020, Mr. Tournant and other Allianz employees retained counsel in connection with the SEC's investigation and the civil lawsuits.  With Allianz's consent, Mr. Tournant retained the Firms, as well as Milbank LLP ("Milbank"), to represent him personally in connection with the investigations and civil matters.[1]  The Firms' personal representations are memorialized in engagement agreements with Mr. Tournant.  (*See* Levine Decl. Exs. A, B.)[2]

As reflected in these engagement agreements, the joint representation of Allianz and Mr. Tournant created "efficiencies from avoiding duplicative efforts by different lawyers and the advice of counsel who has been engaged in the matter and is familiar with its facts, circumstances, and issues." (Levine Decl. Ex. A at 2.)  In addition, by representing Mr. Tournant in his personal capacity, as opposed to merely acting as corporate counsel, the Firms were granted the ability to defend Mr. Tournant and other key employees at their anticipated SEC testimony.  Significantly, under SEC rules, only personal counsel for a witness—not company counsel—may be present during investigative testimony, which takes place in a confidential, non-public proceeding.  *See, e.g.*, SEC Enforcement Manual Section 3.3.5.3.

---

[1] Mr. Tournant's engagement of Milbank was consistent with other Structured Alpha Fund employees, who hired a third law firm to represent them in addition to the Firms.  Milbank represented Mr. Tournant only.

[2] Mr. Tournant was personally represented by the Firms.  This is not the common situation in which corporate counsel provides non-client employees an *Upjohn* warning during any interviews or conversations.  An *Upjohn* warning is a warning given by company counsel to a non-client employee to advise the employee that he is not communicating with his personal lawyer, no attorney-client relationship exists, and any communication may be revealed to third parties if disclosure is in the best interest of the corporation.  *See Upjohn v. United States*, 449 U.S. 383 (1981).

The Firms' joint representation of Allianz and its employees also carried with it certain disadvantages, including the possibility that the joint representation would result in a conflict of interest.  (Levine Decl. Ex. A at 2; Ex. B at 2.)  Both Firms advised Mr. Tournant in writing that they were not aware of any conflict at the time they executed the engagement agreements.  (Levine Decl. Ex. A at 2; Ex. B at 2.)  The Firms' engagement agreements also obligated them—in the event that a conflict arose—to specifically raise, discuss, and resolve it with Mr. Tournant in order for the representation to continue.  (Levine Decl. Ex. A at 2–3; Ex. B at 5.)  Specifically, the S&C engagement agreement provided:

> "In the event we conclude . . . that the interests of the Allianz Entities . . . conflict with your interests (***including, for example, because the Allianz entities are of the view that the joint representation imposes constraints on its ability to cooperate with any government investigation***) such that it may become inadvisable or improper for us to continue to represent you, we will discuss the situation with you ***with a view to arriving at a mutually agreeable solution***."

(Levine Decl. Ex. A at 2 (emphasis added).)  Similarly, the Ropes engagement agreement contained a provision requiring Ropes to advise Mr. Tournant "as soon as we become aware of the conflict."  (Levine Decl. Ex. B at 5.)[3]

The Firms each represented Mr. Tournant personally from on or about November 2020 through June 2021.  At no point before they terminated their attorney-client relationships with Mr. Tournant did either Firm raise (or resolve) any conflict of interest.  In fact, the Firms had

---

[3] The S&C engagement agreement also purported to contain an advance waiver of Mr. Tournant's confidentiality (*see* Levine Decl. Ex. A at 3).  As discussed *infra*, that advance waiver was breached by S&C; was not revisited, as required, once circumstances changed; and was not enforceable.

multiple attorney-client meetings and discussions with Mr. Tournant for the purpose of preparing

Mr. Tournant for his anticipated SEC testimony, among other things.[4]

**B.     The Firms Initially Deny Wrongdoing by Allianz and Mr. Tournant**

On May 5, 2021, the Firms gave a presentation to the SEC on behalf of Allianz in which

they defended Allianz, denying wrongdoing on the part of Allianz and its employees, including

Mr. Tournant.  (*See* Levine Decl. Ex. C.)  The presentation highlighted the sophistication of the

institutional investor clients of the Funds, who were typically "advised by outside consultants" and

had been investing in Structured Alpha for years before the COVID pandemic.  (Levine Decl. Ex.

C at SDNY_01_000052327–30.)    The presentation also emphasized AGI's complete and

comprehensive disclosure of the risks associated with the Funds (*id*. at SDNY_01_000052332–40

(noting disclosure of "no guarantee of achieving investment objective;" "possible change in

investment strategy;" and "liquidity, volatility and market risk")), and the unavoidable negative

impact of the COVID market decline on the market as a whole, and on the Funds in particular,

given the Funds' hedging positions (*id.* at SDNY_01_000052345–59).

**C.     A Structured Alpha Fund Employee's SEC Testimony Alters the Landscape**

On May 20 and May 21, 2021, Stephen Bond-Nelson, another Structured Alpha Fund

portfolio manager, testified before the SEC.  (Levine Decl. Exs. D, E.)  The Firms personally

represented Mr. Bond-Nelson and appeared as his (and Allianz's) counsel at his SEC testimony,

along with another firm that only represented him personally.  (Levine Decl. Ex. D at 3–4.)  The

---

[4] S&C provided Mr. Tournant's undersigned current counsel with copies of its notes of its meetings
with Mr. Tournant between December 2020 and June 2021.  Portions of those notes reflect that
the Firms' purpose in meeting with Mr. Tournant was to prepare for his upcoming SEC testimony.
To preserve the privilege associated with these meeting notes, we have not attached all of the notes
to this motion.  We are happy to provide all notes to the Court for *in camera* inspection at the
Court's direction.

SEC questioned Mr. Bond-Nelson extensively and aggressively regarding various historical risk and other reports in which modifications were made to a few of the many calculations contained in those reports.  In response to the SEC's questioning, Mr. Bond-Nelson acknowledged the changes and that Mr. Tournant may have been involved, but explained to the SEC that the changes were made, among other reasons, to address existing data problems.  (*See, e.g.*, Levine Decl. Ex. D at 103–22, 160–65, 181; Ex. E at 87–93.)

But Mr. Bond-Nelson's testimony abruptly ended in the middle of the second day when he refused to return from a restroom break.  Afterwards, Mr. Bond-Nelson shifted the blame for the alleged report alterations to Mr. Tournant, implicating Mr. Tournant in alterations the Government now claims were done for sinister purposes.  Thereafter, Mr. Bond-Nelson began cooperating with the Government and disengaged from the Firms.  In turn, Mr. Bond-Nelson's testimony became an inflection point in the Firms' strategy in representing Allianz, and in Allianz's cooperation with the SEC and later the USAO.  As S&C advised the Government, "***[i]mmediately after Bond-Nelson's SEC testimony, Allianz SE***: Assumed control and pledged full cooperation in connection with the investigations [referring to both USAO and SEC] [and] [c]ommissioned a forensic review of client reporting issues by S&C and NERA [S&C's consulting expert]."  (*See* Levine Decl. Ex. H at SDNY_01_000054551 (emphasis added).)  In fact, S&C represented to the Government that it initiated the forensic review on May 22, 2021—one day after Mr. Bond-Nelson abruptly ended his SEC testimony.  (*Id.*)  Based on S&C's own admissions (discussed in detail below), a primary goal of the forensic review was to build the Government's case against Mr. Tournant and serve him up as a scapegoat to avoid the worst sanctions for Allianz.

**D.      The Government's Investigations Presented an Existential Threat to Allianz's Worldwide Businesses**

Allianz's change in strategy was necessitated by the existing USAO's and SEC's policies relating to evaluating corporate cooperation in making charging decisions.  The USAO evaluates an entity's cooperation under the Department of Justice's "Principles of Federal Prosecution of Business Organizations" (the "Principles").  (*See* Levine Decl. Ex. I.)  The Principles apply enormous pressure on corporations under investigation to meet strict and burdensome requirements to obtain cooperation credit to avoid the worst possible sanctions—including by assisting with the prosecution of individuals—especially when the Government believes that there may be evidence of wrongdoing.  (*E.g.*, Levine Decl. Ex. I §§ 9-28.300, 9-28.700, 9-28.720.)  The SEC evaluates corporate cooperation under the Seaboard Factors, which similarly condition corporate cooperation credit on the provision of all relevant facts and the implication of individual wrongdoers.  (*See* Levine Decl. Ex. J.)

As S&C repeatedly advised the Government during the many presentations it made after Mr. Bond-Nelson's testimony, Allianz believed that it was facing the "corporate death penalty" for both AGI and Allianz SE (the Allianz parent entity)—resulting in the loss of billions in assets and hundreds (if not thousands) of jobs—in the event the Government insisted on a corporate guilty plea or other sanction pursuant to these policies.  (*See, e.g.*, Levine Decl. Ex. K at SDNY_01_000054673–92 (section entitled "A Guilty Plea is A Death Penalty For a Registered Investment Adviser."); Ex. H at SDNY_01_000054564–87 (section entitled "A Guilty Plea Will Be A 'Corporate Death Penalty' For AGI US").)  Indeed, as S&C put it to the Government in no uncertain terms—a guilty plea would be "***fatal***" to Allianz's businesses.  (Levine Decl. Ex. H at SDNY_01_000054568–69; *see also* Ex. K at SDNY_01_000054777.)  For example, an Allianz guilty plea (or other similar sanction) had the potential not only to bar AGI from acting as an

investment adviser and asset manager, but it would have had devastating consequences for other Allianz entities and its affiliates, even those with no alleged involvement or role in this matter, as they would still be barred by various agency rules from doing business.  (Levine Decl. Ex. H at SDNY_01_000054565–66.)  Accordingly, Allianz believed that obtaining cooperation credit was key to Allianz avoiding the worst possible sanctions and reaching a resolution with the Government that would allow Allianz's businesses to continue.

### E.    The Firms Misuse Their Attorney-Client Relationship with Mr. Tournant to Obtain Evidence Against Him for Allianz's Benefit

The events that occurred immediately after Mr. Bond-Nelson's SEC testimony created a clear conflict for the Firms in continuing their joint representation of Mr. Tournant and Allianz, including that:  (1) Mr. Bond-Nelson disengaged the Firms, began cooperating with the Government, and blamed Mr. Tournant for any purported wrongdoing; (2) Allianz changed its cooperation strategy; and (3) S&C initiated a massive forensic review on behalf of Allianz into Mr. Tournant and others.  Neither of the Firms, however, raised or resolved this conflict with Mr. Tournant, as they were obligated to do under the terms of their respective engagement agreements (*see* Levine Decl. Ex. A at 2; Ex. B at 5), and the rules governing legal practice in New York State, *see, e.g.*, New York Rule of Professional Conduct 1.7 ("[A] lawyer shall not represent a client if a reasonable lawyer would conclude that . . . the representation will involve the lawyer in representing differing interests.").

Instead, the Firms scheduled other meetings with Mr. Tournant on June 3 and 4, 2021, ostensibly to prepare him for his SEC testimony, which, at that time, was scheduled for the following week.  (*See, e.g.*, Levine Decl. Ex. F at 1 (S&C stating at the outset of the meeting on June 3, 2021 (the "June 3, 2021 Meeting"), that ███████████████████████████████ ███████████████████████████████████████████.)  ███████████████████████████

11

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████ (*See* Levine Decl. Ex. F at 25–26, 33 (S&C attorney stating to Mr.

Tournant, in response to Mr. Tournant's mock testimony answer, ████████████████████

██████████████████████████████████████████████████████████

██████) However, as would become clear, the Firms' real purpose in meeting with Mr. Tournant

was to obtain evidence against him, which they would later disclose to the Government in

advocating for Allianz to receive cooperation credit.[5]

As referenced above, unbeknownst to Mr. Tournant or Milbank, S&C had engaged in an

extensive investigation for use against Mr. Tournant prior to the June 3, 2021 Meeting.  This

investigation included, among other things, ██████████████████████████

███████████████████████████████████████ which S&C planned

to use to suggest wrongdoing by Mr. Tournant.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████ (Levine Decl. Ex. F at 45–47.)  In addition to attempting to elicit

---

[5] ██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████ However, as discussed *infra*, S&C's engagement agreement did not give S&C the
right to disclose Mr. Tournant's confidential information to the Government.

admissions as to 

Shortly thereafter, the meeting ended.  (*Id*. at 47.)  Mr. Tournant cut off any direct contact with the Firms after the June 3 Meeting.  Moreover, S&C engaged in these actions despite recognizing that Mr. Tournant was suffering

.

The next day, the Firms informed Milbank that they would be terminating their attorney-client relationship with Mr. Tournant and sent termination letters on June 7, 2021.  (*See* Levine Decl. Exs. L, M.)  Ultimately, Mr. Tournant did not provide SEC testimony.  Because of the Firms' actions, however, the SEC and the USAO obtained every benefit as if the testimony had gone forward, because Mr. Tournant's lawyers simply gave them everything their client said at the meeting.

## F.    S&C Scapegoats Mr. Tournant to Save Allianz

In an effort to prevent the Government from imposing the worst sanctions on Allianz, S&C switched sides and employed a strategy of building the Government's case against Mr. Tournant through the creation of a false and misleading narrative that shifted blame to Mr. Tournant.  In a series of presentations, calls, and document productions between July 2021 and March 2022, S&C packaged and delivered to the Government its massive forensic analysis (which relied, in part, on Mr. Tournant's privileged information).  In addition, S&C read verbatim to the Government from its notes of its privileged communications with Mr. Tournant, including, but not limited to, reading

the full contents of its 48-pages of notes from the privileged June 3, 2021 Meeting (Levine Decl. Ex. R at 4.)[6]  In fact, S&C disclosed █████████████████████████████ and other information it had learned at the privileged June 3, 2021 Meeting during its very first call with the USAO on July 13, 2021.   (Levine Decl. Ex. N at SDNY_01_000055211; Ex. O at SDNY_01_000055226.)

But S&C went beyond mere fact disclosure to the Government—it affirmatively (and unjustly) advocated for the Government's prosecution of Mr. Tournant, in lieu of charging Allianz. For instance, in multiple presentations, S&C used the below slide resembling a most-wanted poster with photos of Mr. Tournant and two of his colleagues, Mr. Bond-Nelson and Trevor Taylor, noting that the Government will have a strong case against Mr. Tournant, "in part due to AGI US's cooperation:"[7]

---

[6] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████

[7] Mr. Bond-Nelson and Mr. Taylor both ultimately pled guilty to criminal charges.



SDNY_01_000054608

(Levine Decl. Ex. H at SDNY_01_000054608; Ex. K at SDNY_01_000054762.)

      In the same group of presentations, S&C also quoted from comments of Deputy Attorney General Lisa Monaco, emphasizing that the Government should prosecute Mr. Tournant in lieu of Allianz as the Government's "first priority in corporate criminal matters [is] to prosecute the individuals" (not corporations).

15



(Levine Decl. Ex. H at SDNY_01_000054609.)

And, leaving absolutely no doubt as to S&C's goals on behalf of its corporate client, the USAO's notes confirm that Mr. Tournant's former lead counsel from S&C (who had participated extensively in the June 3, 2021 Meeting), stated to the Government (including the United States Attorney himself):

> Sitting here where I am *would like to see you prosecute GT [Mr. Tournant]* – would like to help you do that but may not have anyone at AGI US to help you do that if guilty plea[.]

(Levine Decl. Ex. G at SDNY_01_000054788 (emphasis added).)   S&C's lead counsel even recognized that Mr. Tournant "may file [a] disciplinary claim against [S&C]" because of the information S&C had provided to the Government, but S&C was willing to face disciplinary charges in an effort to obtain cooperation credit for Allianz.  (*Id*. at SDNY_01_000054791.)

16

1.      **S&C Investigates and Crafts the Government's Case Against Mr. Tournant Regarding Alleged Alterations**

Targeting Mr. Tournant and using his privileged materials, S&C built the Government's case regarding the alleged report and data alterations, and even specifically noted that it was willing to act (and was acting) as the "***back office***" for the Government in doing so.  (Levine Decl. Ex. P at SDNY_01_000054510; Ex. G at SDNY_01_000057491.)   S&C's presentations detail the "Valuable Cooperation" and "Resource-Intensive Forensic Review Of Client Reporting Issues" that S&C performed for the Government, noting Allianz's "continuous and proactive cooperation" over many months.   (Levine Decl. Ex. H at SDNY_01_000054551–63; Ex. K at SDNY_01_000054716.)

S&C noted that it and its economic consulting firm, NERA, "devoted over 16,700 hours to forensic review," that involved, among other things, "[c]onduct[ing] extensive email searches to identify reports sent to clients," and "[c]reat[ing] detailed spreadsheets identifying each altered report," and "[c]reat[ing] modules showing the history of the alteration and every person involved."  (Levine Decl. Ex. H at SDNY_01_000054553–54; Ex. K at SDNY_01_000054717.) S&C also noted that the alleged alterations were "Difficult To Detect" and suggested that those alleged alterations would not have been uncovered by the Government, absent the forensic review into the reporting undertaken by S&C and its experts.   (Levine Decl. Ex. H at SDNY_01_000054534–35, SDNY_01_000054538–40.)

Ultimately, the fruits of the immense resources devoted to S&C's investigation and review were themselves "reflected in [the Government's] Statement of Facts" included in the single-count criminal information charging AGI with securities fraud.  (Levine Decl. Ex. K at SDNY_01_000054717.)  The Statement of Facts and, in turn, the Indictment against Mr. Tournant, allege alterations to various reports and other data, including to risk reports, "Greek" reports,

position data, expected value sheets, and daily performance data.  (ECF No. 2 ¶¶ 39-68.)  In a series of slides, S&C claimed credit for uncovering each of these categories of alterations, and it is clear that the Government based the Indictment almost entirely on S&C's work.  (Levine Decl. Ex. K at SDNY_01_000054716–22.)

Moreover, S&C used Mr. Tournant's statements from the privileged June 3, 2021 Meeting as part of its purported evidence to unfairly suggest to the Government that Mr. Tournant was not being truthful about the reasons for the alleged data and report alterations. (*See* Levine Decl. Ex. H at SDNY_01_000054536–37.)

### 2. S&C Investigates and Crafts the Government's Case Against Mr. Tournant Regarding Alleged Obstruction of Justice

S&C was also instrumental in providing the Government with the confidential communications that the Government used as the basis for its aggressive obstruction of justice theory against Mr. Tournant (not involving Mr. Tournant's alleged misrepresentations to the Government, but rather to Allianz's in-house counsel who then provided this information to the SEC).  (*See* ECF No. 2 ¶¶ 84-87.)  Indeed, from S&C's first meeting with the Government on July 13, 2021, S&C began to press this obstruction of justice theory on behalf of Allianz to implicate Mr. Tournant in wrongdoing.

As S&C noted during its presentations, Allianz "Provided Valuable Information for [the] DOJ's Obstruction Investigation," namely, notes of its privileged communications with Mr. Tournant and Mr. Bond-Nelson that led directly to the charge:

18

(Levine Decl. Ex. H at SDNY_01_000054560.)   The information S&C provided to the Government pertaining to this charge also included key quotations from S&C's notes of its privileged June 3, 2021 Meeting with Mr. Tournant, including Q&A between Mr. Tournant and the Firms regarding his discussion with Mr. Bond-Nelson:



(*Id*. at SDNY_01_000054561.)

## G.   The Government Knew About Mr. Tournant's Attorney-Client Relationship with the Firms

The Government understood that Mr. Tournant was personally represented by the Firms, and nevertheless induced the Firms, and in particular S&C, to act as a government informant and the main witness against him.   Indeed, the SEC was fully aware of the Firms' personal representation of Mr. Tournant by April 2021, if not earlier, when it sent Mr. Tournant's subpoena to testify directly to Ropes as Mr. Tournant's counsel.[8]   (Levine Decl. Ex. Q.)   The SEC took the testimony of Mr. Bond-Nelson in May 2021—in which the Firms appeared as counsel for Mr. Bond-Nelson and Allianz.[9]   In addition, the full contents of the June 3, 2021 Meeting, in which it

---

[8] Milbank later corresponded with the SEC regarding the scheduling of Mr. Tournant's testimony.

[9] As Mr. Tournant does not currently have access to the USAO's communications with the SEC, the record on this issue is incomplete.   However, as set forth in Mr. Tournant's accompanying

is clear that the Firms were acting as Mr. Tournant's counsel in preparing him for his anticipated testimony, were disclosed to the Government beginning in November 2021.  (*See* Levine Decl. Ex. R at 4 (noting that S&C's 48-page transcription notes of the June 3, 2021 Meeting were ████████ ██████████████████████) )

Then, beginning in January 2022, Mr. Tournant's undersigned current counsel repeatedly informed the USAO of Mr. Tournant's attorney-client relationship with the Firms, and that the Government was wrongfully in possession of Mr. Tournant's privileged information.  On January 28, 2022, the USAO contacted Mr. Tournant's undersigned current counsel to relay that it was contemplating obstruction charges against Mr. Tournant stemming from Mr. Tournant's privileged statements to the Firms concerning ███████████████████ during the June 3, 2021 Meeting. At that point, and again a few days later, Mr. Tournant's current counsel objected and told the USAO that the Firms were previously engaged as Mr. Tournant's personal counsel, including during the June 3, 2021 Meeting.   On February 9, 2022, Mr. Tournant's counsel sent the Government a copy of the Firms' engagement agreements.  (*See* Levine Decl. Ex. S (letter from Mr. Tournant's counsel to the Government summarizing the issues communicated to the Government during the preceding weeks, and noting that Mr. Tournant's fundamental rights had been severely compromised as a result of the disclosure of his confidential, privileged information).)

Thereafter, on or about February 25, 2022, the USAO represented that, in bringing the Indictment, it would ***not*** rely on any privileged statements conveyed by S&C to the USAO. However, the Government would not make any representations about whether it would use the

---

Motion to Compel the Government to Produce *Brady* Materials in the SEC's Files, the SEC and the USAO engaged in a joint investigation, which suggests that the SEC's knowledge can be imputed to the USAO.

privileged statements at trial. (*See id.*) Despite these representations, and with complete knowledge of the full nature of the relationship between S&C and Mr. Tournant—and the serious confidentiality, privilege, and conflict-of-interest violations at play—the Government still participated in S&C's March 1, 2022 presentation in which lead counsel at S&C not only explicitly told the Government that he would "like to see" Mr. Tournant prosecuted and "would like to help [the Government] do that," but also admitted that Mr. Tournant "may file [a] disciplinary claim against [S&C]" because of the information S&C had provided to the Government. (*See* Levine Decl. Ex. G at SDNY_01_000054788, SDNY_01_000054791.)

**H.      S&C and Allianz Are Rewarded For Their Cooperation Against Mr. Tournant**

S&C's fervent efforts on behalf of Allianz ultimately paid off. The Government adopted S&C's misleading narrative regarding Mr. Tournant's alleged misconduct nearly wholesale, and Allianz was able to reach a favorable plea deal with the Government at the expense of Mr. Tournant. Allianz SE, the parent entity, avoided any adverse consequences, while AGI pled guilty to just one count of securities fraud and obtained favorable approval by the Government that any wrongdoing was isolated to Mr. Tournant's team. (*See, e.g.,* Levine Decl. Ex. T at 1 ("The misconduct occurred only within the small Structured Products Group at AGI US. The Government's investigation has not revealed evidence that anyone at AGI US outside of the Structured Products Group was aware of the misconduct before March 2020. The investigation also has not revealed that anyone at any other organizations that fell within the broader umbrella of the parent company Allianz [] was aware of or participated in the misconduct.").)

The U.S. Attorney himself specifically emphasized Allianz and AGI's "full[] cooperat[ion]" at a press conference announcing Mr. Tournant's criminal indictment:

> AGI did not self-report this fraud, they didn't even discover it; the outstanding attorneys at the SEC figured it out first. ***Now once the fraud was discovered, AGI and its parent company Allianz fully cooperated with our investigation, and I***

**want to specifically commend Allianz, and the leaders of Allianz, for their willingness to do the right thing** and compensate the innocent victims of this fraudulent scheme. **That cooperation and the willingness to compensate victims are factors that led to a significant reduction in the fine that AGI will be required to pay. It's also a substantial reason why this office will not charge Allianz and will not seek a deferred prosecution agreement or any other type of resolution with Allianz**.

See United States Attorney's Office for the Southern District of New York, *U.S. Attorney Announces Charges Against Three Portfolio Managers and Allianz Global Investors US*, YOUTUBE (May 17, 2022), https://www.youtube.com/watch?v=Q9ZiLt3sOxg.  That is, although Allianz did not self-report the fraud, Allianz's full cooperation thereafter led to a "significant reduction" in financial and criminal penalties for Allianz including, perhaps most significantly, no criminal charges whatsoever for the Allianz parent entity.  *Id.*

The USAO unsealed its indictment of Mr. Tournant on May 17, 2022.[10]  (ECF No. 2.)  The Indictment is rife with allegations that pertain to the privileged and confidential information disclosed to the Firms regarding Mr. Tournant, particularly S&C's readout of the privileged June 3, 2021 Meeting notes.  Among other things, the Indictment alleges that Mr. Tournant carried out a fraudulent scheme by ███████████████████████████████████ which was discussed during S&C's extensive cross-examination of Mr. Tournant during the June 3, 2021 Meeting.  ████████████████████████████

---

[10] On the same day, the SEC also charged Mr. Tournant in a civil complaint alleging substantially the same set of facts.  *SEC v. Gregoire Tournant*, 22 Civ. 4016 (S.D.N.Y. 2022) (LLS).

**THE COURT SHOULD DISMISS THE INDICTMENT OR HOLD A HEARING TO
DETERMINE WHETHER THE INDICTMENT SHOULD BE DISMISSED**

The Second Circuit in *United States v. Schwimmer*, 924 F.2d 443 (2d Cir. 1991)

("*Schwimmer II*") established two standards for the dismissal of an indictment when the

Government intrudes into a criminal defendant's attorney-client relationship, both of which are

met here. First, cases involving "manifestly and avowedly corrupt" governmental intrusions

require dismissal even without a showing of prejudice. *Id.* at 446-47. Second, in cases in which

the Government has been exposed to a defendant's privileged communications, the Government

must meet the standards established in *Kastigar v. United States*, 406 U.S. 441 (1972), and

"demonstrate that the evidence it uses to prosecute an individual was derived from legitimate,

independent sources." *Schwimmer II*, 924 F.2d at 446; *see also, e.g.*, *United States v. Landji*, 2021

WL 5402288, at *28 (S.D.N.Y. Nov. 18, 2021) ("The same protection [applicable under *Kastigar*]

applies where the Government has obtained information protected by the attorney-client

privilege.").

Here, the Government flagrantly intruded on Mr. Tournant's attorney-client relationship

by encouraging and inducing his former counsel to switch sides and build the criminal case against

him, and to effectively become an arm of the Government—the Government's "back office," in

the words of the lead S&C attorney. As such, the Court should conclude, on the current record,

that the Government's conduct was "manifestly and avowedly corrupt" such that it was *per se*

prejudicial and requires dismissal of the Indictment. Alternatively, the Court should hold a

hearing, following pre-hearing discovery, to determine the full scope of the Government's

interactions with Mr. Tournant's former attorneys and the extent to which the Indictment and the

Government's trial team and agents have been tainted pursuant to *Kastigar* through their improper

exposure to Mr. Tournant's privileged communications.

I.   **THE INDICTMENT SHOULD BE DISMISSED BECAUSE MR. TOURNANT'S FORMER LAWYERS SWITCHED SIDES AND JOINED IN HIS CRIMINAL PROSECUTION**

The Court should dismiss the Indictment on the current record on the grounds that the Government's intrusion into Mr. Tournant's attorney-client relationship was "manifestly and avowedly corrupt." *Schwimmer*, 924 F.2d at 447; *see also Gartner*, 518 F.2d at 637 ("While this Court has never adopted the *per se* rule of dismissal, it has . . . cautioned that 'if circumstances warranted it we would not shrink from such a result.'" (quoting *United States v. Rosner*, 485 F.2d 1213, 1228 (2d Cir. 1973))); *United States v. Sabri*, 973 F. Supp. 134, 146-47 (W.D.N.Y. 1996) (dismissing a charge based on the government's manipulation of the defendant's attorney-client relationship that the court found to be "offensive to the principles which underlie our criminal justice system"). When the government's conduct "touches upon the relationship between a criminal defendant and his attorney, such conduct exposes the Government to the risk of a fatal intrusion and must be accordingly carefully scrutinized." *Landji*, 2021 WL 5402288, at *23 (quoting *Gartner*, 518 F.2d at 637). The rule requiring dismissal of an indictment "has been applied in the past to the Government's intrusion upon the attorney-client relationship of a defendant where the conduct has been an offensive interference with the defendant's rights without any justification." *Gartner*, 518 F.2d at 637.

Although the Second Circuit has not confronted a case involving conduct that is similar to the conduct at issue here, the Fourth Circuit addressed a similar (but less egregious) situation in *United States v. Schell*, 775 F.2d 559 (4th Cir. 1985), holding that the government violated an individual's due process rights when it induced his former counsel to switch sides and actively participate in the prosecution of that individual. *Id.* at 565-66. In *Schell*, the court dismissed an indictment against two defendants where an attorney who briefly represented them, later joined the United States Attorney's Office and participated in the prosecution of the broader conspiracy

underlying the indictment against the defendants.  *Id.*  The court held that dismissal of the indictment was required, despite the fact that the Government attempted to screen this attorney from the portion of the case against his former clients and this attorney did not possess any confidential information with respect to his former clients.  *Id.*  In holding that the governmental intrusion was *per se* prejudicial, the court stated:

> The relationship between an attorney and his client is a sacred one.  In that relationship, the client must be secure in the knowledge that any information he reveals to counsel will remain confidential.  The confidentiality of the attorney-client relationship is severely compromised, if not destroyed, when, after representing a client, a lawyer joins in the criminal prosecution of that client *with respect to the identical matter about which the attorney originally counseled the client.*  Such switching of sides is fundamentally unfair and inherently prejudicial.  Without question, the client's right to a fair trial, secured by the due process clauses of the fifth and fourteenth amendments, is compromised under these circumstances.

*Id.* at 565 (emphasis in original).

Here, with the Government's knowledge and encouragement, Mr. Tournant's former S&C attorneys switched sides and collaborated with the Government to build its prosecution against him as part of a strategy to obtain more favorable treatment for Allianz.  The Government not only encouraged and permitted S&C's actual betrayal of its former client, but S&C's actions are additionally attributable to the Government due to the coercive pressure placed on Allianz by the Government's corporate cooperation policies.

### A. The Government Collaborated with S&C in its Prosecution of its Former Client, Mr. Tournant

From approximately July 2021 to March 2022, S&C participated in a series of presentations and calls with the Government during which it organized and collected the evidence that the Government used to prosecute Mr. Tournant and ultimately advocated for Mr. Tournant's prosecution.  *See* Background § F.1.  In summarizing the work that it did for the Government, S&C noted that it acted as the "back office" for the Government (Levine Decl. Ex. P at

SDNY_01_000054510), and, along with its consulting expert, "devoted over 16,700 hours"—the equivalent of *nine professionals working full-time for a year*—to its forensic review to identify allegedly altered data and reports, which included creating "detailed spreadsheets identifying each altered report" and "modules showing the history of the alteration and every person involved." (Levine Decl. Ex. H at SDNY_01_000054553–54.)

Additionally, S&C provided the Government with multiple verbatim readings from its notes of privileged meetings to prepare Mr. Tournant for his SEC testimony, including, but not limited to, the June 3, 2021 Meeting. As such, the intrusion into the attorney-client relationship in this case is far greater than that at issue in *Schell*, which did not involve the disclosure of any confidential communications—let alone an ambush of a client by his own lawyers—and in which the Government at least made attempts to screen the defendant's former attorney from the prosecution. *See Schell*, 775 F.2d at 565-66.

S&C also took credit for providing the Government with the information that the Government later used as the basis for its obstruction of justice charge against Mr. Tournant. *See* Background § F.2. As alleged the Government's obstruction charge is premised on Mr. Tournant and Mr. Bond-Nelson allegedly providing false information to Allianz's *counsel* which was ultimately provided to the SEC (*see* ECF No. 2 ¶¶ 84-87), and the overt acts identified in the Indictment are based on facts that S&C claimed to have provided to the Government based on its meetings with Mr. Tournant and Mr. Bond-Nelson (*compare id.* ¶¶ 87(a)-(b), *with* Levine Decl. Ex. H at SDNY_01_000054561).

As bad as it was to disclose a former client's confidences, S&C went further than the mere disclosure of facts and their purported conclusions concerning Mr. Tournant—it actively lobbied for the Government to indict its former client so that Allianz would receive cooperation credit for

facilitating Mr. Tournant's prosecution.  *See* Background § F.  For example, S&C lead counsel advised the Government, with the United States Attorney present, that "[s]itting here where I am would like to see you prosecute GT [Mr. Tournant] – would like to help you do that but may not have anyone at AGI US to help you do that if guilty plea[.]"  *Id*.; (Levine Decl. Ex. G at SDNY_01_000054788.)  Accordingly, the limited record currently available to Mr. Tournant makes clear that Mr. Tournant's former attorneys switched sides and collaborated with the Government to build the case against him.

### B.   S&C's Conduct in Betraying Mr. Tournant and His Attorney-Client Relationship Is Attributable to the Government

S&C's betrayal of Mr. Tournant is attributable to the Government because of the coercive pressure that the Government's corporate cooperation policies placed on Allianz.  *See United States v. Stein*, 541 F.3d 130, 146 (2d Cir. 2008) ("*Stein II*").  The Principles specifically induced S&C to serve as the Government's "back office" and build the case against Mr. Tournant.  *See* Background § F.1.  Because, as described below, the Principles left S&C little choice but to turn on its own client, the Court should conclude that the Government is responsible for S&C's conduct.  In addition, S&C's conduct is attributable to the Government because the Government continued to encourage S&C's actions, including revealing Mr. Tournant's client confidences, despite knowing that S&C represented him individually.

#### 1.   S&C's Acts Are Attributable to the Government Because the Principles Induced S&C to Switch Sides and Betray Mr. Tournant

The Principles contain a list of factors that the Government must consider in determining whether to indict an entity under investigation, including "the corporation's willingness to cooperate, including as to potential wrongdoing by its agents" (the "Corporate Cooperation Obligation").  (Levine Decl. Ex. I §§ 9-28.300 A.)  Here, the Corporate Cooperation Obligation

effectively deputized corporate counsel in this case as government agents so that they could obtain the cooperation credit necessary to avoid indictment or some other catastrophic penalty.

In *Stein II*, the Second Circuit affirmed the district court's dismissal of an indictment where the Principles' Corporate Cooperation Obligation induced a cooperating company—in that case, KPMG—to violate the defendants' constitutional rights by ceasing to advance attorneys' fees. 541 F.3d 130 (2d Cir. 2008). The court applied the "close nexus" test to determine whether the Government bore responsibility for KPMG's decision. *Id.* at 146 ("Actions of a private entity are attributable to the [Government] if 'there is a sufficiently close nexus between the [Government] and the challenged action of the . . . entity so that the action of the latter may be fairly treated as that of the [Government] itself.'" (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974))). The close nexus test is met when:

> the state exercises coercive power, is entwined in the management or control of the private actor, or provides the private actor with *significant encouragement*, either overt or covert, or when the private actor operates as a *willful participant in joint activity* with the State or its agents . . . or is *entwined with governmental policies.*

*Id.* at 147 (emphasis in original) (quoting *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 187 (2d Cir. 2005)).

Applying this test in *Stein II*, the Second Circuit held that, based on the Corporate Cooperation Obligation of a previous version of the Principles (and the prosecutors' statements to KPMG regarding the Principles), KPMG's conduct in ceasing to advance the defendants' attorneys' fees constituted governmental action. *Id.* at 147-51. The court stated:

> [T]he government forced KPMG to adopt its constricted Fees Policy. The Thompson Memorandum [*i.e.*, the Principles] itself—which prosecutors stated would be considered in deciding whether to indict KPMG—emphasizes that cooperation will be assessed in part based upon whether, in advancing counsel fees, "the corporation appears to be protecting its culpable employees and agents." Since defense counsel's objective in a criminal investigation will virtually always be to protect the client, KPMG's risk was that fees for defense counsel would be

advanced to someone the government considered culpable.  So the only safe course
was to allow the government to become (in effect) paymaster.

*Id.* at 148.

The record demonstrates that the Principle's Corporate Cooperation Obligation placed

enormous pressure on Allianz.  S&C repeatedly represented to the Government that both AGI and

its parent entity, Allianz, were facing the "corporate death penalty" and other "fatal" consequences

in the event that it was indicted by the Government.  *See* Background § F.

But, as in *Stein II*, Allianz "was never 'free to define' cooperation independently," *Stein II*,

541 F.3d at 149; rather, pursuant to the Corporate Corporation Obligation, S&C repeatedly relied

on its substantial work in conducting its forensic review and building the Government's case

against Mr. Tournant as a primary reason that the Government should not impose the most severe

sanctions on Allianz.  *Id.*; (*see, e.g.*, Levine Decl. Ex. H at SDNY_01_000054608 (showing a

most-wanted poster style picture of Mr. Tournant and noting that "[a] guilty plea is unnecessary

because DOJ action against individuals will satisfy the goals of federal prosecution"; and "DOJ

will have a strong case against the wrongdoers, in part due to AGI US's cooperation").)  The

Government is therefore responsible for S&C's actions under the close nexus test because the

Principles created a situation in which the only safe course to avoid the "corporate death penalty"

for Allianz was for S&C to switch sides and betray Mr. Tournant.

### a. The All-or-Nothing Approach to Cooperation Credit Induced S&C and Allianz to Scapegoat Mr. Tournant

The Department of Justice has revised the Principles multiple times since *Stein II*, but not

only do they still include the Corporate Cooperation Obligation as one of the relevant factors—

they now take an all-or-nothing approach to cooperation credit:

> In order for a company to receive any consideration for cooperation under this
> section, the company ***must identify all individuals substantially involved in or
> responsible for the misconduct*** at issue, regardless of their position, status or

seniority, and **provide to the Department _all_ relevant facts relating to that misconduct**.  If a company seeking cooperation credit declines to learn of such facts or to provide the Department with complete factual information about the individuals substantially involved in or responsible for the misconduct, its cooperation will not be considered a mitigating factor under this section.

(Levine Decl. Ex. I § 9-28.700 (emphasis added).)

The Department of Justice first adopted the all-or-nothing approach to obtaining cooperation credit in 2015, pursuant to a memorandum issued by then-Deputy Attorney General Sally Quillian Yates (the "Yates Memorandum").  (Levine Decl. Ex. U at 3 ("**To be eligible for _any_ cooperation credit, corporations must provide to the Department all relevant facts about the individuals involved in corporate misconduct.**" (emphasis in original)).)[11]  In fact, in words that are prophetic of the situation here, an S&C attorney (not involved in the case) commented on the increased pressure that the 2015 changes imposed on corporations to turn on their employees:

> the Yates Memo's focus on individual accountability will likely strain the relationship between a company under investigation and its employees. Particularly in investigations where the facts are ambiguous and the issue of culpability is not clear cut, the tension between a company's desire to give its employees the benefit of the doubt and its obligations to find and report facts suggesting misconduct could cause irreparable damage to corporate culture and unity.

(Levine Decl. Ex. X at 4; _see also_ Levine Decl. Ex. Y (article re the Yates Memorandum's changes entitled "DOJ: Companies Serve Up Your Executives!").)

S&C's "back office" work for the Government and its advocacy for Mr. Tournant's prosecution are directly attributable to the Principles' all-or-nothing approach to corporate cooperation credit.  As opposed to giving Mr. Tournant any benefit of the doubt, Allianz needed a

---

[11] Although the all-or-nothing standard was briefly relaxed during the Trump Administration, (Levine Decl. Ex. V at 3 (conditioning cooperation credit on the identification of the individuals who were "substantially involved or responsible for" the corporate misconduct), the current administration reverted to the Yates Memorandum's standard in remarks and a memorandum of Deputy Attorney General Lisa Monaco on October 28, 2021.  (_See_ Levine Decl. Ex. W at 1–2.)

scapegoat to satisfy the onerous Corporate Cooperation Obligation requirement, and S&C—acting on Allianz's behalf—served up Mr. Tournant to meet that requirement.  As noted above, S&C's own statements to the Government make clear the importance to the charging decision as to Allianz and AGI (and ultimately the Indictment against Mr. Tournant), which they attributed to their forensic and investigatory work in building the Government's case against Mr. Tournant.  *See* Background § F.  As in *Stein II*, because there is a clear nexus between the Principles' all-or-nothing cooperation obligation and S&C's conduct in turning on Mr. Tournant, S&C's conduct is fairly attributable to the Government.

> **b.  The Principles Induced S&C to Structure Mr. Tournant's Engagement Letter to Give It Cover in the Event It Decided to Turn on Its Former Client**

Perhaps the best evidence of the overbearing coercion imposed by the Principles is the fact that S&C—indisputably a leader of the white-collar bar and one of the most prestigious law firms in the world—blatantly disregarded an unwaivable conflict of interest that developed during its representation, and turned on its former client.  S&C was pushed to the extreme in attempting to comply with the Principles and satisfy the Government, even recognizing that its actions could likely give rise to Mr. Tournant's filing of a disciplinary complaint against the law firm.  (*See* Levine Decl. Ex. G at SDNY_01_000054791.)

The same S&C commentary referenced above highlighted the ethical dilemma that the Principles created for corporate counsel:

> [C]ompany counsel must now tread even more carefully before deciding to jointly represent a company and its employees in government interviews or related civil litigation.  A joint representation might:
>
> - Signal to the DOJ, perhaps inadvertently, that the company is not committed to turning over all relevant evidence of employee misconduct, and instead prefers to keep its interests aligned with those of its employees.

- Increase the risk that counsel will learn a privileged fact suggesting an employee's culpability in the course of the individual representation. Counsel and the company would then be unable to share that fact ***without the employee's consent***, creating an immediate and perhaps unwaivable conflict of interest for counsel, and potentially restricting the company's ability to provide all relevant information.

(Levine Decl. Ex. X at 6-7 (emphasis added).)

Notwithstanding these issues, S&C opted to represent Mr. Tournant personally, concurrently with Allianz. As a result, S&C owed him a "duty of undivided loyalty." *First NBC Bank v. Murex, LLC*, 259 F. Supp. 3d 38, 57 (S.D.N.Y. 2017) ("A concurrent representation implicates 'the duty of undivided loyalty which an attorney owes to each of his clients,' who are entitled to the lawyer's 'undivided allegiance and faithful, devoted service.'" (quoting *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976))); *see also* New York Rule of Professional Conduct 1.7, cmt. 1 ("Loyalty and independent judgment are essential aspects of a lawyer's relationship with a client . . . . Concurrent conflicts of interest, which can impair a lawyer's professional judgment, can arise from the lawyer's responsibilities to another client, a former client or a third person, or from the lawyer's own interests. A lawyer should not permit these competing responsibilities or interests to impair the lawyer's ability to exercise professional judgment *on behalf of each client*." (emphasis added)). Pursuant to this duty, S&C was required to treat each of its clients equally and was prohibited from preferring one over the other. *See, e.g.*, *Felix v. Balkin*, 49 F. Supp. 2d 260, 270 (S.D.N.Y. 1999) (stating that "[t]he lawyer's right to transfer and utilize information for the good of both his clients does not mean that the lawyer has the right to turn against one or the other, for he owes ***equal loyalty to both his clients***" (emphasis added)).

Moreover, it is clear from the present record that S&C intentionally structured its engagement letter with Mr. Tournant, pursuant to a direction from the Principles, to attempt to

give it ethical cover in the event that it later determined that it needed to turn on Mr. Tournant to

save Allianz, as happened here.  At the time of *Stein II*, the Principles identified corporate joint

defense agreements (in the same provision pertaining to the advancement of attorneys' fees) as a

negative factor in assessing whether the Corporate Cooperation Obligation was met.  *See Stein II*,

541 F.3d at 136.  Based on the *Stein II* decision, the Department of Justice deleted this provision.

(*See* Levine Decl. Ex. I § 9-28.730 (stating that a corporation's entry into a joint defense agreement

with its employees will not, in and of itself, render the corporation "ineligible to receive

cooperation credit").  The revised Principles, however, direct corporations to structure such

agreements so as not to "disable[]" the corporation from satisfying its fact disclosure obligations

to the Government.  (Levine Decl. Ex. I § 9-28.730.)  The Principles instead now state:

> Of course, the corporation may wish to avoid putting itself in the position of being
> disabled, by virtue of a particular joint defense or similar agreement, from
> providing some relevant facts to the government and thereby limiting its ability to
> seek such cooperation credit.  Such might be the case if the corporation gathers
> facts from employees who have entered into a joint defense agreement with the
> corporation, and who may later seek to prevent the corporation from disclosing the
> facts it has acquired.  ***Corporations may wish to address this situation by crafting
> or participating in joint defense agreements, to the extent they choose to enter
> them, that provide such flexibility as they deem appropriate.***

(Levine Decl. Ex. I § 9-28.730 (emphasis added).)

S&C specifically took the Government's suggestion in the Principles and crafted an

engagement agreement with Mr. Tournant that we expect S&C would claim did not put Allianz

"in the position of being disabled . . . from providing some relevant facts to the [G]overnment and

thereby limiting its ability to seek such cooperation credit."  (Levine Decl. Ex. I § 9-28.730.)  The

S&C engagement agreement provided:

> The mutual interests of the Allianz Entities and you may be best served by sharing
> oral or written confidential information ("Materials").  Some or all of the Materials
> may be protected from disclosure to anyone else as a result of the attorney client
> privilege, the work-product doctrine, or other applicable privileges.  You agree that
> S&C may share such Materials (when and if S&C deems it appropriate) with the

> Allianz Entities, representatives of the Allianz Entities, third parties retained by S&C, and other persons.  You agree that if management of the Allianz Entities deems it appropriate, the Allianz Entities may decide to release Materials to the government and to other persons outside of the Allianz Entities who agree to keep such Materials confidential, to release Materials in response to legal process, and to waive any applicable privileges to the disclosure of such Materials.  You understand that such disclosure may mean that the protections of the attorney-client privilege that you may have for such Material would no longer apply.

(Levine Decl. Ex. A at 3.)

As discussed below, Mr. Tournant is prepared to demonstrate, if the Court determines that a hearing is necessary, that this provision did not permit S&C's actions for multiple reasons, including, but not limited to, that:   S&C (1) failed to adhere to its professional duties to Mr. Tournant; (2) failed to abide by the conflict resolution and other provisions of the engagement letter; and (3) went far beyond the mere sharing of materials and acted as an advocate for its former client's prosecution.  Such a hearing, however, is unnecessary because Mr. Tournant respectfully submits that it is clear that the Government's pressure induced S&C to include these provisions in Mr. Tournant's engagement letter in the first place, and these provisions, and S&C's conduct in betraying its former client, is so inimical to our system of justice that it should be deemed "manifestly and avowedly corrupt."

\* \* \* \*

Accordingly, the Court should conclude that S&C's conduct in switching sides and turning on its former client is a direct consequence of the coercive pressure the Government's corporate cooperation policies placed on Allianz.  The Court should therefore conclude that these actions constitute governmental action and should result in the dismissal of the Indictment.

### 2.     The Government Knew that the Firms Personally Represented Mr. Tournant

S&C's conduct is also attributable to the Government because the Government collaborated with S&C despite knowing that the firm represented Mr. Tournant.  *See* Background

§ G. Although the record is incomplete on this issue, the SEC was aware of the Firms' personal representation of Mr. Tournant by April 2021, if not earlier, when it sent Mr. Tournant's subpoena to testify directly to Ropes as Mr. Tournant's counsel. *Id*.; (Levine Decl. Ex. Q.) And, beginning in January 2022, Mr. Tournant's undersigned current counsel discussed the Firms' prior representation of Mr. Tournant with the Government on multiple occasions, after the Government approached counsel to convey that it was contemplating obstruction charges against Mr. Tournant stemming from the privileged June 3, 2021 Meeting. (Levine Decl. Ex. S.) The Government nevertheless continued to collaborate with S&C on the investigation and prosecution of Mr. Tournant with full knowledge of its attorney-client relationship with Mr. Tournant, including, but not limited to, during the March 1, 2022 presentation at which S&C—addressing the United States Attorney himself—touted Allianz's role in building the case against Mr. Tournant and advocated for his prosecution. (Levine Decl. Ex. G at SDNY_01_000054788.) Accordingly, as in *Schell*, the Government's knowledge that Mr. Tournant's former counsel was building its case against him in the same matter in which it represented him should result in the dismissal of the charges against him.

## II. ALTERNATIVELY, THE COURT SHOULD HOLD A HEARING TO DETERMINE WHETHER THE INDICTMENT SHOULD BE DISMISSED

To the extent that the Court does not dismiss the Indictment on the present record, the Court should hold an evidentiary hearing, after ordering hearing-related discovery, to determine: (1) the extent of the Government's knowledge and encouragement of S&C's decision-making in switching sides and building a case against Mr. Tournant; and (2) even absent Government responsibility for S&C's actions, the extent to which the Government's exposure to Mr. Tournant's privileged communications tainted the Government's trial team, its evidence, and the Indictment.

### A. Absent Dismissal, a Hearing Is Necessary to Determine the Extent of the Government's Responsibility for S&C's Conduct

Should the Court find that the record is not sufficiently developed to conclude that the Government bears responsibility for permitting or encouraging the S&C attorneys to switch sides and build a case against their former client, Mr. Tournant respectfully requests that the Court hold an evidentiary hearing to further develop the factual record, as has been done in similar circumstances. For example, in response to the defendant's motion to dismiss in *Stein II*, this Court held a multi-day evidentiary hearing, after discovery, to determine the Government's role in KPMG's decision to cease advancing attorneys' fees. *Stein II*, 541 F.3d at 140 ("Judge Kaplan ordered discovery and held a three-day evidentiary hearing . . . to ascertain whether the government had contributed to KPMG's adoption of the Fees Policy."). More recently, then-Chief Judge McMahon found that an evidentiary hearing was necessary to determine whether the government was responsible for compelling the defendant's interview with counsel for his cooperating employer, *United States v. Connolly*, 2018 WL 2411216, at *11 (S.D.N.Y. May 15, 2018) ("But that does not mean the court can simply grant the motion today. In the cases cited by the parties where the specter of a *Garrity/Kastigar* violation was raised, the issue was resolved after some form of hearing or after pretrial discovery."), before concluding after the hearing that the Government was responsible for counsel's conduct during the company's internal investigation, *United States v. Connolly*, 2019 WL 2120523, at *10-14 (S.D.N.Y. May 2, 2019). At the very least, a hearing is necessary to determine the nature and scope of the Government's relationship with Mr. Tournant's former attorneys.

**B.**      **Absent Dismissal, a Hearing Is Necessary to Determine the Extent to Which the Government's Access to Mr. Tournant's Privileged Statements to S&C Tainted the Indictment and Prosecution Team**

Absent dismissal, the Court should also hold a *Kastigar* hearing to determine the extent to which exposure to Mr. Tournant's privileged communications tainted the Government's trial team, its trial evidence, and the Indictment.  *See, e.g.*, *United States v. Schwimmer*, 892 F.2d 237, 245 (2d Cir. 1989) ("*Schwimmer I*") (remanding based on the district court's failure to conduct an evidentiary hearing to "determine whether the government's case was in any respect derived from a violation of the attorney-client privilege").  *Kastigar* provides defendants with "a comprehensive safeguard" and "very substantial protection."  *United States v. Allen*, 864 F.3d 63, 91 (2d Cir. 2017) (quoting *Kastigar*, 406 U.S at 460-61).  *Kastigar* imposes a "total prohibition" on the use of a defendant's privileged information, as well as any evidence directly or indirectly derived from such information.  *Id.* (quoting *Kastigar*, 406 U.S at 460); *see, e.g.*, *Landji*, 2021 WL 5402288, at *28 ("Kastigar 'prohibits the prosecutorial authorities from using the compelled testimony in any respect.'" (quoting *Kastigar*, 406 U.S. at 453)).  This prohibition includes, among other things, the use of privileged information as an "investigatory lead" and "the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures."  *Allen*, 864 F.3d at 91 (quoting *Kastigar*, 406 U.S. at 460).

Where a defendant makes a "threshold showing" that the prosecution is factually related to privileged information accessed by the Government, the Court should hold a taint hearing.  *United States v. Hoey*, 2016 WL 270871, at *4 (S.D.N.Y. Jan. 21, 2016) (quoting *United States v. Helmsley*, 726 F. Supp. 929, 933 (S.D.N.Y. 1989)); *but see Landji*, 2021 WL 5402288, at *28 (finding that the defendant did not need to make any threshold showing in order to get a hearing, and that a hearing was necessary because the Second Circuit has not clarified in the context of the attorney-client privilege the nature of the threshold showing a defendant must make to shift the

burden to the government).  At the hearing, the Government has the "heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources."  *Kastigar*, 406 U.S. at 461-62; *see also Schwimmer II*, 924 F.2d at 446 (stating that the Government "must demonstrate that the evidence it uses to prosecute an individual was derived from legitimate, independent sources").

In *Allen*, the Second Circuit cited with approval the legal standards concerning the scope of a *Kastigar* right adopted by the D.C. Circuit in the Iran-Contra/Oliver North case.  *Allen*, 864 F.3d at 92-93 & n.134 (citing, among others, *United States v. North*, 910 F.2d 843, 861 (D.C. Cir. 1990) ("*North I*") and opining that the standards set forth are "helpful").[12]  In *North I*, the D.C. Circuit provided the following guidance concerning the nature of a *Kastigar* hearing:

> the District Court must hold a full *Kastigar* hearing that will inquire into the *content* as well as the *sources* of the grand jury and trial witnesses' testimony.  That inquiry must proceed witness-by-witness; if necessary, it will proceed line-by-line and item-by-item.  For each grand jury and trial witness, the prosecution must show by a preponderance of the evidence that no use whatsoever was made of any of the immunized testimony either by the witness or by the [government] in questioning the witness.  This burden may be met by establishing that the witness was never exposed to [the defendant's] immunized testimony, or that the allegedly tainted testimony contains no evidence not "canned" by the prosecution before such exposure occurred.  Unless the District Court can make express findings that the government has carried this heavy burden as to the content of all of the testimony of each witness, that testimony cannot survive the *Kastigar* test.  We remind the prosecution that the *Kastigar* burden is "heavy" not because of the evidentiary standard, but because of the constitutional standard: the government has to meet its proof only by a preponderance of the evidence, but *any* failure to meet that standard must result in exclusion of the testimony.

*North I*, 910 F.2d at 872-73 (emphasis in original).  Absent dismissal, a *Kastigar* hearing is necessary because the limited record demonstrates unequivocally that Mr. Tournant had an

---

[12] The D.C. Circuit withdrew and superseded its opinion in part in *United States v. North*, 920 F.2d 940 (D.C. Cir. 1990) ("*North II*"), but adhered to its original disposition as to the scope of the hearing with respect to the potential for grand jury taint, *id.* at 947.

attorney-client relationship with S&C and that S&C disclosed Mr. Tournant's privileged communications to the Government.

### 1. Mr. Tournant Holds the Privilege Over His Confidential Communications With S&C

Pursuant to his S&C engagement letter, Mr. Tournant had a personal attorney-client relationship with S&C. The S&C engagement agreement set forth the terms of "S&C's joint representation of [Mr. Tournant] and the Allianz entities" and stated that "we [S&C] will also jointly represent [Mr. Tournant], subject to the terms and conditions below, together with Milbank LLP in connection with the Structured Alpha Matters." (Levine Decl. Ex. A at 1.) As such, Mr. Tournant's confidential communications with S&C, including those made during the June 3, 2021 Meeting to prepare him for his anticipated SEC testimony, are clearly covered by the attorney-client privilege. *See, e.g.*, *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) ("The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice.").

Although the Government has not at this point asserted that Mr. Tournant waived privilege over these communications under the advanced waiver provision of the S&C engagement letter (*see* Levine Decl. Ex. A at 3), any such argument should be rejected as to all privileged communications, but especially as to the June 3, 2021 Meeting.[13] In entering into the joint

---

[13] If the Government advances a waiver argument, Mr. Tournant is prepared also to offer expert ethics testimony and additional facts to demonstrate that an advanced waiver of confidentiality at the discretion of a lawyer's other client is void at the outset and not enforceable. *See Baird v. Koerner*, 279 F.2d 623, 634 (9th Cir. 1960) ("The maintenance of [the attorney-client] privilege has been ruled of such importance by the California courts that even if the client waived the privilege by written contract, his attorney cannot rely on the waiver, nor can he violate the privilege."); New York Rule of Professional Conduct 1.7, cmt. 14 ("A client's consent to a nonconsentable conflict is ineffective.").

representation agreement, S&C "confirm[ed]" in the agreement that both it and Allianz were not then aware of any conflict that would prevent S&C's joint representation of Mr. Tournant. (*See* Levine Decl. Ex. A at 2.) Because the absence of a conflict was an essential element of its ability to engage in a joint representation, S&C agreed to raise and resolve any conflict with Mr. Tournant as soon as it became aware of one. (*Id.*) In other words, S&C was not permitted to do what it did in this case—refrain from raising its obvious conflict so that it could misuse its attorney-client relationship with Mr. Tournant to gather information to build the Government's case against him.

The evidence reveals that after Mr. Bond-Nelson's SEC testimony—and before the June 3, 2021 Meeting—S&C received information establishing that a conflict of interest existed between Allianz and Mr. Tournant. *See* Background § E. As S&C advised the Government, it and Allianz changed its strategy "[i]mmediately after Bond-Nelson's SEC testimony," and started a forensic review designed to build the Government's case against Mr. Tournant. (*See* Levine Decl. Ex. H at SDNY_01_000054551.) As part of that review, S&C developed evidence that ███████████████████████████████—rather than advising Mr. Tournant or Milbank in advance that it had uncovered this information, it instead used it to sandbag Mr. Tournant at the June 3, 2021 Meeting under the guise of preparing him for his SEC testimony. (*See, e.g.*, Levine Decl. Ex. F at 45-47.) In fact, S&C's lack of candor and deception towards Mr. Tournant regarding the true nature and circumstances of the June 3, 2021 Meeting—████████████████████████ ████████████████████████████████████ when, in reality, S&C was gathering evidence against him to be used to further Allianz's efforts to obtain cooperation credit—further demonstrate that S&C was operating under a conflict of interest.

By failing to raise and resolve its conflict prior to the June 3, 2021 Meeting and thereby misleading Mr. Tournant about its continuing undivided loyalty to him as a client, S&C breached

its obligation to Mr. Tournant, and such breach vitiates any advanced privilege waiver that could otherwise conceivably apply to these statements, even if such waivers were not void at the outset.[14] A breach in this fashion would certainly preclude S&C from acting as his lawyer and enforcing the agreement in a manner that prejudices Mr. Tournant.  In addition, the advance waiver provision would be unenforceable to permit S&C's conduct here because lawyers are required to revisit the terms of advanced waivers as circumstances change.  The New York City Bar Association made this clear in the context of corporate representations, concluding that although no *per se* bar exists to lawyers' representing a corporation and its employees, the ethics rules:

> …impose[] three important restrictions on the permissibility of such representations. First, the lawyer must be able to conclude that a disinterested lawyer would, given the facts at hand, regard multiple representation as in the interest of both the corporate client and the employee client. Second, the lawyer must obtain the consent of both clients after full disclosure of the advantages and risks involved in multiple representation. Third, ***the lawyer must be alert to changes in circumstances that would render continuation of multiple representation impermissible.***

N.Y.C. Bar Formal Op. 2004-02 (2004) (emphasis added); s*ee also* N.Y.C. Bar Formal Op. 2016-2 (2016) (lawyers have "ongoing duty to monitor conflicts throughout the representation").  Thus, "[e]ven if a client has validly consented to waive future conflicts . . . the lawyer must reassess the propriety of the adverse concurrent representation . . . when an actual conflict arises."  New York Rule of Professional Conduct 1.7, cmt. 22A.  Indeed, when counsel withdraws from a joint representation, "'[t]he former client must also be informed that she has the right to insist that all of her confidences and secrets or specific confidences and secrets be held inviolate.'"  NYSBA

---

[14] The engagement agreement's advanced waiver provision, in any event, did not permit S&C's conduct because it permitted S&C to share Mr. Tournant's confidential materials only if doing so was in the "mutual interests" of both Mr. Tournant and Allianz, and, in each instance, only "if and when S&C deem[ed] it appropriate" to do so in further of these interests.  (*See* Levine Decl. Ex. A at 3.)  Given S&C's switching of sides and working for the Government against Mr. Tournant, its disclosure of his confidential communications was clearly not in his interests.

Ethics Op. 823 (2008) (alteration in original) (quoting N.Y. Co. Lawyers Association Ethics Op. 716 (1996)).

Thus, once Mr. Bond-Nelson's SEC testimony took place in late May 2021, and once S&C decided to use the pretext of an SEC prep session on June 3 in order to cross-examine Mr. Tournant on the issues that are now central to the current case, S&C was required to obtain additional waivers in writing based on a candid disclosure of the facts and circumstances if it was not going to withdraw its representation.  *See* New York Rule of Professional Conduct 1.9(a) ("A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing").  But Mr. Tournant neither gave informed consent, nor confirmed it in writing, beyond the engagement letter he signed more than six months before the June 3, 2021 Meeting, and more than a year before S&C advocated that he be prosecuted and disclosed his confidences.

### 2. Mr. Tournant's Privileged Communications Were Shared With the Government and Used in the Indictment

As mentioned above, the Firms had multiple confidential meetings with Mr. Tournant over the course of representing him, including the June 3, 2021 Meeting.  Beginning in July 2021 and continuing for months thereafter, S&C disclosed Mr. Tournant's privileged and confidential information to the Government, and even went so far as to provide the Government with verbatim readings from its notes of the entire June 3, 2021 Meeting (*see* Levine Decl. Ex. R at 4) and to

include excerpts of those notes in multiple presentations to the Government (*see, e.g.*, Levine Decl. Ex. P at SDNY_01_000054536–37).[15]

The Indictment is replete with allegations that pertain to the privileged and confidential information disclosed to the Firms regarding Mr. Tournant, particularly S&C's readout of the full contents of the privileged June 3, 2021 Meeting notes.  For instance, the Indictment alleges, among other things, that Mr. Tournant carried out a fraudulent scheme by ███████████████████ ███████████████████████ which was discussed during S&C's extensive cross-examination of Mr. Tournant during the June 3, 2021 Meeting.  *See* Background § H; ███████████████████ ███████████████████████

Accordingly, a *Kastigar* hearing is warranted to determine the extent of the taint to the Government's case based on its improper access to attorney-client privileged materials.

### C.    Full Discovery Should Be Provided in Advance of a *Kastigar* Hearing

If the Court is not inclined to dismiss the case now and instead grants a hearing, the Court should order that the parties be permitted to take discovery on the issues relevant to the hearing.  *See Stein II*, 541 F.3d at 140 (noting that Judge Kaplan "ordered discovery and held a three-day evidentiary hearing" to resolve the issues raised in the defendants' motion).

---

[15] While the record is incomplete as to the precise scope of Mr. Tournant's information shared with the Government, the USAO does not contest that Mr. Tournant's information was accessible to the USAO's prosecution team and agents.  (ECF No. 40 at 24-25.)

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Tournant respectfully requests that the Court grant his motion for dismissal of the Indictment or, in the alternative, for a hearing and grant such further and other relief as may be just and proper.

Dated: New York, New York
　　　　December 23, 2022

By:　　/s/ Seth L. Levine
　　　　Seth L. Levine
　　　　Alison M. Bonelli

**LEVINE LEE LLP**
1500 Broadway, Suite 2501
New York, New York 10036
Telephone: (212) 223-4400
slevine@levinelee.com
abonelli@levinelee.com

**BUCKLEY LLP**
Daniel R. Alonso
Olivia Rauh
1133 Avenue of the Americas, Suite 3100
New York, New York 10036
dalonso@buckleyfirm.com
orauh@buckleyfirm.com