

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 15, 2024

**BY EMAIL**

The Honorable Laura Taylor Swain
Chief United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:     ***United States v. Gregoire Tournant, 22 Cr. 276 (LTS)***

Dear Judge Swain:

      The Government respectfully submits this letter in advance of the sentencing of Gregoire Tournant ("Tournant" or the "defendant"), scheduled for Friday, December 6, 2024 at 11 a.m. Proper application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") yields a term of imprisonment that well exceeds the maximum allowable sentence, and is thus statutorily-adjusted to the maximum possible sentence of 10 years' imprisonment for two counts of investment advisor fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

      While under the particular circumstances of this case, the Government does not believe that a term of imprisonment of that length is necessary to serve the purposes of sentencing, the Government respectfully submits that a substantial term of no fewer than seven years' imprisonment is necessary to reflect the seriousness of the offense, promote respect for the law, deter others, and ensure the fairness across similar cases. For years, over 100 investors—including large pension funds for workers across the United States—entrusted Tournant to manage their money, believing that he was faithfully acting in their interests as a fiduciary. Tournant took advantage of the trust those investors placed in him, carrying out a long-term, calculated scheme to defraud his clients about the risks he was taking with their money. That fraud prevented investors from having the information they needed to make informed decisions and protect themselves, all the way up until Tournant's funds collapsed, losing investors billions of dollars. Tournant responded to that collapse by trying to cover up his crime, and even now downplays the severity of his misconduct. Even accounting for Tournant's health issues, a substantial term of imprisonment is necessary in this case.

## I.     FACTUAL BACKGROUND

      For years, the defendant lied to and defrauded investors in the funds that he managed, for his own personal gain. The defendant lied to investors about the risks associated with their investments and the efforts that he and others were taking to minimize those risks. When the risks

that he had lied about materialized, investors lost billions of dollars: after the Covid-19 pandemic struck, the funds managed by the defendant lost about $7 billion in market value.

From in or about 2016 through in or about March 2020, Tournant and others engaged in a scheme to defraud investors in a series of investment funds (the "Structured Alpha Funds" or the "Funds") managed by Allianz Global Investors U.S. LLC ("AGI US"). Tournant acted as portfolio manager for the Structured Alpha Funds. At their height, the Funds managed over $11 billion in assets. (Presentence Investigation Report ("PSR") ¶¶ 12, 14, 17).

Tournant and his accomplices carried out the fraudulent scheme in three ways.

*First*, Tournant and others overstated the level of independent oversight that AGI and Allianz were exercising over the Funds' investment strategy. *Second*, they misrepresented the hedging and other risk-management strategies they were undertaking to protect investor funds. *Third*, to hide the true risk associated with the Funds' investments, Tournant and his accomplices fraudulently altered documents that AGI provided to investors, including open position spreadsheets, risk reports, projected expected value data, historical performance data, holdings data, attribution data, and the "Greeks"—standard metrics in options trading concerning measures of risk.

In short, contrary to representations made to investors, Tournant deployed an investment strategy that prioritized returns over risk management, contrary to the marketing materials associated with the Structured Alpha Funds. After the market downturn following the onset of the pandemic in March 2020, the Funds lost more than $7 billion in market value, including more than $3.2 billion in lost principal, even as, during the time relevant to the fraud, Tournant earned compensation, including performance-based compensation, totaling tens of millions of dollars.

## A. Offense Conduct

AGI US marketed and sold at least 17 Structured Alpha funds to approximately 114 institutional investors. As of December 2019, the Structured Alpha Funds held approximately $11 billion in assets under management. (*Id.*). Investors in the Structured Alpha Funds trusted that AGI US would manage their assets in accordance with the fiduciary duties of an investment adviser, and investors believed that the information AGI US provided was accurate and complete in all material respects. (PSR ¶ 15).

From at least January 2016 through March 2020, Tournant and two other managers of the Structured Alpha Funds, Trevor Taylor, and Stephen Bond-Nelson, materially misled investors about the significant downside risks of Structured Alpha. AGI US made false and misleading statements to current and prospective investors that substantially understated the risks being taken by the Funds and overstated the level of independent risk oversight over the Funds. AGI US failed to disclose and sought affirmatively to withhold relevant risk information. (PSR ¶ 18).

1.     Tournant Misrepresented The Level of AGI US's Oversight

AGI US repeatedly represented to investors in marketing materials for the Structured Alpha Funds that risk was "continuously managed and monitored at both the portfolio level by the investment team and the firm level." AGI US described itself as having "three lines of defense": (i) the business, including portfolio management and sales; (ii) Enterprise Risk Management ("ERM"), Compliance, and Legal departments; and (iii) an Internal Audit function. AGI US advertised to investors that an "independent enterprise risk management function" operated as the second line of defense and provided "independent portfolio risk oversight." Further, and as discussed in more detail below, AGI US marketed to investors as a protection against risk the creation of daily reports by Investment Data Services GmbH – Analysis and Reporting Services ("IDS"), an affiliate of AGI US that was independent from the Structured Products Group and whose compensation was not tied to the performance of the Funds. These daily reports were intended for internal use by AGI Risk Management in order to conduct 'stress tests' to model the impact of various one-day market changes to the Funds. In a 2014 meeting, Tournant told one investor that the Funds had "very strict controls" and described AGI US's parent company, Allianz, as a "master cop," noting that he had "behind me one of the largest and most conservative insurance companies in the world monitoring every position that I take to make sure that from legal, compliance, and risk standpoint that I'm well within the guidelines . . . which is very, very different than if I had my own hedge fund firm, where in some form or fashion I can overrule just about anything." (PSR ¶¶ 21, 27, 33, 36).

As Tournant was aware, those representations were false.

In fact, the compliance and risk management functions at AGI US, which investors believed maintained an independent risk management function to monitor and manage risk, were weak and failed to maintain adequate oversight of Tournant and the team managing the Structured Alpha Funds. (PSR ¶ 19).

        Although communicating accurately and candidly with investors is a core duty of an investment advisor, the control functions at AGI US were not designed to, and did not, function to ensure that risk for the Structured Alpha Funds was being monitored in line with what investors had been told. No one in the control function sought to verify that Tournant and his colleagues were adhering to the hedging strategies they represented to investors they would follow, or to the alpha targets they had promised, despite that the materials containing these representations were reviewed and approved by the AGI US Legal and Compliance departments. Client reporting and communications with existing clients about existing products were not required to be reviewed by Compliance. (PSR ¶ 34). When Internal Audit conducted an audit of the Structured Products Group in 2017, multiple red flags were identified though no meaningful follow up was conducted. (PSR ¶ 37). Specifically, in 2017 an internal audit did not trigger a review of the accuracy of the representations in investor materials by anyone outside the Structured Products Group. Instead, Internal Audit assigned that review to the product specialists within the Structured Products Group, whose compensation was directly tied to the quarterly performance of the Funds. (*Id.*).

Tournant was aware of these control failures and exploited them to manage the Structured Alpha Funds in a manner inconsistent with representations to investors that Tournant and his team were operating with sufficient oversight. As a result of quality issues with AGI US's back-office functions, Tournant and others were able to employ more aggressive investment strategies than they had told investors they would employ, and thereby exposed investors to undisclosed risk. The ability of Tournant and others to deviate from the representations that had been made to investors was possible, in part, because of fundamental failures in AGI US's controls as they related to the Funds. (PSR ¶¶ 34, 38).

2.    Tournant Misrepresented The Hedging and Risk Strategy

AGI US represented to investors in marketing materials that the Structured Alpha Funds had a specific set of hedging positions in place to protect against an overnight or short-term equity-market crash. Consistent with those misleading statements, Tournant told certain investors that the Funds' managers considered themselves "risk managers first, return managers second." (PSR ¶ 21).

The Structured Alpha Funds had two components: the "beta" component, which delivered a return to investors equivalent to a specified benchmark index, such as the S&P 500 Index; and the "alpha" component, which involved a complex options strategy that varied by Fund and was designed to deliver additional returns regardless of the benchmark index's performance, as well as hedging positions to protect against an overnight or short-term equity-market crash. (PSR ¶ 14). The Structured Alpha Funds' options strategy had four main components: (a) range-bound spreads (option positions designed to profit during typical market movements); (b) directional spreads (option positions designed to profit when equity indexes rise or fall more than usual); (c) hedging positions (options positions designed to hedge against short-term market crashes); and (d) restructuring, which involved adjusting positions as current market levels approached strike prices by covering and closing out of existing positions at a cost and selling new short puts further out-of-the-money to recapture premium and reduce risk. Beginning in October 2015, AGI US consistently represented to investors on a slide entitled "Position examples" in marketing materials that it would purchase hedges for the Funds that ranged -10 to -25% "out of the money" to protect the portfolio against an overnight crash, as well as a short-term equity-market crash, defined as a decline of 10 to 15% in less than 5 days. In certain marketing materials, the "Position examples" slide noted that hedges were "typically" within the -10 to -25% range.[1] The relevant investor agreements did

---

[1] While Tournant does not dispute these "position examples," in his sentencing submission he minimizes the importance of these representations, claiming that they were "not promises or representations as to whether the Funds would build other hedges in building actual or future positions." Dkt. 158 at 3, 11, 14-15. Tournant's self-serving views on whether investors were entitled to rely on those examples has no merit. The "position examples" disclosed to investors self-evidently informed investors' expectations of the Funds' typical future positions, and Tournant meaningfully deviated from those examples. His argument at sentencing that investors

not contain representations regarding hedging placements, and did not mention the -10 to -25% range. Beginning in approximately late 2015, AGI US, at Tournant's direction, began purchasing certain hedges called "tail risk hedges" for the Funds closer to -10 to -45%, and at one point in 2018, as much as 66% out of the money. Beginning in February 2018, tail risk hedges were purchased at strike prices that averaged between -30 to -50% out of the money. These further out of the money hedges were cheaper but also less protective in the event of a market downturn. (PSR ¶ 14, 24).

Despite the representations regarding the Funds' trading strategy, Tournant, who directed Taylor and Bond-Nelson, deployed an investment strategy that prioritized returns over effective risk management, contrary to the representations made to investors. They repeatedly failed to purchase the hedging positions that investors were promised. Further, they managed the funds belonging to their largest investor to higher risk targets than promised. (PSR ¶¶ 19, 21).

       3.      <u>Tournant Falsified Documents to Cover Up His Fraud</u>

Tournant not only concealed from investors the true facts regarding their exposure in the event of a significant market downturn, he likewise falsified documents to prevent detection of his fraudulent scheme. (PSR ¶ 19). With respect to certain investors who asked for documentation to assess the true risks of the portfolio and to guide their investment decisions, Tournant, Bond-Nelson, and Taylor fraudulently altered the data that was provided to investors in a way that consistently understated the magnitude of the risk to which the investors were exposed. Specifically, they manipulated numerous reports that related to certain predictive metrics regarding risk and other information provided to investors to conceal the extent of the Funds' true risk. (PSR ¶¶ 20, 21). They did so in several respects.

First, Tournant and Taylor altered open position worksheets, which showed each position in the portfolio, before certain investor meetings. Before meetings, Tournant and Taylor manually changed the worksheets to bring the strike distances of the hedges closer to the money. Because hedges that are closer to the money are worth more in a market decline, these alterations made the portfolio seem better hedged against a market downturn, and therefore less risky. Relatedly, these alterations concealed that AGI US had abandoned its promise to maintain hedges in the Structured Alpha Funds with strike distances in the range of -10 to -25% out of the money. In one instance, Taylor altered a spreadsheet to change a hedge's strike distance from -45.01 to -24.71%. Tournant, on at least one occasion, simply removed certain positions from the open positions worksheet that he intended to show to an investor. These changes had the effect of making the portfolio appear lower risk than it actually was. (PSR ¶ 25).

Second, on one occasion, Tournant manually altered holdings data that was sent to one potential investor, who ultimately invested. After the potential investor requested holdings data

---

should not have taken these examples literally only evinces Tournant's failure to meaningfully accept responsibility for the loss caused by his fraud.

for a certain fund, Tournant took the accurate holdings data and changed 31 of the fund's 576 open positions from short positions to long positions, and then sent this fraudulent data to the potential investor. Tournant made these changes by altering both the quantity of the positions as well as the internal descriptive codes – for example, from "short puts" to "tail risk hedges." The overall effect of Tournant's changes was to fraudulently show a portfolio that was more protected against risk than the fund's actual portfolio. (PSR ¶ 26).

Third, as discussed above, IDS, a group within AGI US that was purportedly independent of the Structured Alpha Funds and that group's compensation structure, created daily risk reports for AGI Risk Management in order to (among other things) show 'stress tests' which modeled the impact of various one-day changes in the market on the Structured Alpha Fund. Notwithstanding that these reports were intended for internal use, certain investors received these reports upon request. Unbeknownst to the investors who received copies of the risk reports, some of whom believed they were created by IDS, Tournant and Bond-Nelson altered over 75 risk reports that went to six investors, as well as to four consultants that advised approximately 35 additional investors. Tournant and Bond-Nelson altered these risk reports by manually changing certain 'stress test' results, which in certain circumstances, made it appear that in significant one-day market downturns, the Funds would lose less money. Tournant and Bond-Nelson also made other changes to the 'stress test' results to, among other things, correct for errors in the IDS data. On one occasion, Bond-Nelson took a projected loss of -30.82%, and cut it in half, to -15.41%. On another occasion, Bond-Nelson took a projected loss of -30.95% and simply reduced it by 20, to a much lower projected loss of -10.95%. (PSR ¶ 27).

Fourth, Tournant and Bond-Nelson altered AGI internal "Greeks" data that went to nine investors. The Greeks are metrics that provide measures of risk associated with options positions. According to Tournant, he informed investors, Greeks were not a useful measure to evaluate a multi-week strategy like Structured Alpha, as the Greeks were designed to evaluate risk over a one-day period. In some cases, these alterations were done to make the Structured Alpha Funds appear less sensitive to market changes. Changes were also made to correct for errors in the data. Dozens of altered Greeks were sent to approximately nine investors and six consultants that advised approximately 35 additional investors. (PSR ¶ 28).

Fifth, Tournant, Bond-Nelson, and others altered daily performance data that went to three investors, in some cases, by "smoothing" the data to reduce the magnitude of the largest losses as well as the gains on surrounding dates. This made it appear as though the Structured Alpha Funds were less responsive to market downturns, and therefore less risky in the event of such a downturn. As an example of this smoothing, in July 2016, Tournant directed members of the Structured Products Group to send daily performance data that he had smoothed to an investor in the Funds. As one example of the smoothing in this data sent, Tournant changed the daily performance number for August 24, 2015, a notable market downturn, from -18.26% to -9.26%. This made the Structured Alpha Funds appear less sensitive to the late August 2015 market volatility. (PSR ¶ 29).

Sixth, Tournant altered certain attribution data that went to one investor that showed the portfolio's gains and losses attributed to the three types of positions in the strategy. In some

cases, the changes were made to correct errors in the data, in other cases the changes made it appear as though the portfolio had more significant hedging positions than were in fact in place. (PSR ¶ 30).

Seventh, and Taylor modified expected value ("EV") sheets that were shown on a screen to certain investors who wanted to see the modeling capabilities of the Structured Alpha Team during on-site meetings, some of which resulted in losses on certain positions appearing smaller. EV sheets were one of many internal portfolio management tools used by the Structured Alpha Team that predicted how the different positions in the Structured Alpha Funds' portfolio could perform if the market went up or down by a specific percentage. They were shown to certain investors who requested them during client meetings, as an example of one of the many tools used by the portfolio managers to monitor the portfolio and associated risk. In certain market movements, EV sheets showed that certain positions were projected to lose significant amounts of money. Tournant and Taylor manually altered certain EV sheets to decrease projected losses that they felt appeared too large. Consistent with the other types of alterations described above, the alteration of EV Sheets understated the magnitude of the downside risk of the strategy. (PSR ¶ 31).

Eighth, in 2016, AGI US entered into an agreement with the Structured Alpha Funds' largest investor ("Investor-1") to change Investor-1's investment strategy for its AGI Alpha Multi-Beta Series LLC I ("Variable Alpha Funds"). In accordance with the new strategy, AGI agreed to adjust the net annual alpha target from a fixed target to a variable range, between 500 and 700 bps, depending on market conditions. Discussions with Investor-1 regarding the variable alpha targets were ongoing and the targets were revised in August 2016, January 2017, and again in January 2019. The agreement originally provided that the objective of the strategy was to manage the Variable Alpha Funds such that in a lower-volatility situation, the variable alpha target would be lower; in a higher- volatility situation, a higher alpha target would be used. This was designed in part to reduce Investor-1's exposure to downside risk. Rather than adhere to this agreement, during much of the relevant time, Tournant managed Investor-1's funds to a higher alpha target on an annualized basis than agreed upon in certain years. Tournant did not disclose this to Investor-1, but instead showed Investor-1 fraudulent reports during meetings that showed the variable alpha funds being managed to a lower alpha target than was in fact the case. Tournant also circulated similarly fraudulent reports internally at AGI US. This deviation in strategy exposed Investor-1 to greater financial risk than Investor-1 had agreed to assume. (PSR ¶ 32).

Multiple AGI US employees within the Structured Products Group who were not directly involved in the fraudulent scheme were aware that Tournant and Bond-Nelson were altering numbers on certain reports before sending them to investors. To cover up their wrongdoing, Tournant and Bond-Nelson explained to their fellow employees in the Structured Products Group that they were simply correcting "errors" in reporting generated by back-office functions. Because there were ongoing issues with the back office data reporting, multiple members of the Structured Products Group who might otherwise have reported the fraudulent scheme accepted this explanation, and carried on with their work without reporting

it internally. (PSR ¶ 38).

4.      Tournant Obstructed the SEC's Investigation

In approximately March 2020, AGI US learned in approximately March 2020 that risk reports had been altered and sent to investors. The SEC thereafter began an investigation. After the SEC told AGI US's parent company about its investigation, lawyers for AGI US sent Bond-Nelson an email with questions about risk reports. Prior to that email, during an August 3, 2020 joint interview with AGI's internal and external counsel, Tournant and Bond-Nelson lied about the reasons for their fraudulent alterations to risk data for the Funds that was provided to investors.  After this interview, Tournant instructed Bond-Nelson to lie when responding to an email from AGI's in-house counsel seeking information to answer certain of the SEC's questions about alterations to investor documents. Bond-Nelson spoke with Tournant, and they decided to provide false information in an email to lawyers for AGI US, about how the alterations were done to risk reports to more accurately model the increase in volatility for certain scenarios. The SEC later independently discovered certain of the alterations, as well as their fraudulent nature, during its own investigation, but only did so months later, thus delaying their investigation. On another occasion, Tournant coached Bond-Nelson on what to say if asked by counsel about AGI's hedging positions.  Tournant told Bond-Nelson to prepare for such a conversation by pretending that Tournant was a lawyer and practicing his answer. Additionally, Tournant made false statements in an interview with Allianz's counsel, and Taylor, Tournant, and another employee discussed deleting their WhatsApp messages. (PSR ¶¶ 39, 47, Page 45).

Bond-Nelson, consistent with his agreement with Tournant, repeated the lies which they had agreed to convey to the SEC. On May 20 and 21, 2021, Bond-Nelson gave pre-complaint testimony to the SEC under oath, in which he answered questions both about the Funds and suspicious alterations to documents sent to investors that the SEC had discovered. During his testimony, Bond-Nelson steadfastly maintained that any alterations had not been fraudulent but were instead attempts to make investor documents more accurate.  During the middle of the second day of his testimony, however, Bond-Nelson abruptly refused to answer any further questions and adjourned his testimony.  Bond-Nelson's individual counsel then separately communicated to the SEC that Bond-Nelson wished to cooperate with the SEC's investigation.

5.      Tournant Profited Significantly From His Fraud

As a result of the fraudulent scheme, the performance of the Structured Alpha Funds, and therefore the profits that flowed to AGI US and up to its parent companies, were inflated, as was the compensation paid to Tournant and the others. The Structured Alpha Funds performed well for 15 years, including through market disruptions, until the Covid-related market volatility in March 2020. (PSR ¶ 16). AGI US charged a 30% performance fee, calculated as 30% of each Fund's quarterly returns in excess of the relevant benchmark index, subject to a cumulative high-water mark at the client account level. Due to the Funds' performance and AGI US's compensation structure, Tournant and his team received a share of

the performance fees, with Tournant and Taylor receiving the largest share, approximately $13 million in compensation each in 2019. (PSR ¶ 22). Thus, from 2015 through 2019, Tournant was the highest or second-highest paid employee at AGI US. (PSR ¶ 23).

At the time of the market downturn in the advent of the COVID-19 pandemic, the Funds managed by Tournant suffered substantial losses, including losses in excess of 90% as to two particular funds. Investors collectively lost approximately $3.2 billion dollars in principal. Those investors included pension funds for teachers, clergy, bus drivers, engineers and others. (PSR ¶ 16).

## II.  PROCEDURAL HISTORY

On May 16, 2022, a grand jury sitting in this District returned Indictment 22 Cr. 276 (LTS) (the "Indictment"), which charged Tournant in five counts: conspiracy to commit securities fraud, investment adviser fraud, and wire fraud; securities fraud; two counts of investment adviser fraud; and conspiracy to obstruct justice.  On May 17, 2022, the Indictment was unsealed, and Tournant was arrested and presented before a Magistrate Judge in the District of Colorado. On December 23, 2022, January 30, 2023, and September 19, 2023, Tournant filed, respectively: a motion to compel the Government to produce Brady materials; a motion to dismiss the Indictment, and a motion for a Bill of Particulars, for production of Brady materials, for dismissal of the wire fraud object of the conspiracy charge, and to strike surplusage in the Indictment. (Dkt. Nos. 45, 53, 98). Those motions were largely denied. (Dkt. Nos.  81, 114). On June 7, 2024, Tournant pleaded guilty pursuant to a plea agreement to a Superseding Information, S1 22 CR 276 (LTS), charging him with two counts of investment advisor fraud. Sentencing is currently scheduled for December 6, 2024.

## III.  APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."  *United States v. Booker*, 543 U.S. 220, 252 (2005).  Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered.  Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.  That sub-paragraph sets forth the purposes as:

>  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>  (B) to afford adequate deterrence to criminal conduct;

>  (C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

## IV.    DISCUSSION

### A.    The PSR Calculation

Consistent with the plea agreement between the parties and the Government's position on the amount of "loss" involved under U.S.S.G. § 2B1.1(b)(1), the PSR correctly calculates the applicable Guidelines, as follows:

- Pursuant to U.S.S.G § 3D1.2(d), Counts One and Two are treated as a single group. (PSR ¶ 51).

- The applicable guidelines are found in U.S.S.G. § 2B1.1, and, because the offenses of conviction have statutory maximum terms of imprisonment of less than 20 years, the base offense level is 6 pursuant to U.S.S.G. § 2B1.1(a)(2). (PSR ¶ 52).

- Pursuant to U.S.S.G. § 2B1.1(b)(1), the offense level is increased based on the amount of loss involved.  According to the PSR, because the total loss associated with the offense was $3,238,748,199.69, which exceeds $550 million, the offense level is increased by 30 pursuant to U.S.S.G. § 2B1.1(b)(1)(P). (PSR ¶ 53). As discussed below, the defendant disputes that calculation.

- Because the offense involved more than 10 victims—indeed, over 100—an increase of 2 levels is warranted pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i). (PSR ¶ 54).

- Because the scheme involved sophisticated means, including the alteration of reports sent to investor victims, an increase of 2 levels is warranted pursuant to U.S.S.G. § 2B1.1(b)(10)(C). (PSR ¶ 55).

- Because the offense involved a violation of the securities laws, namely the Investment Advisers Act of 1940, and at the time of the offense, the defendant was an investment advisor, as defined in 15 U.S.C. § 80b-2(a)(11), an increase of 4 levels is warranted pursuant to U.S.S.G. § 2B1.1(b)(20)(A)(iii). (PSR ¶ 56).

- Because the defendant willfully obstructed or impeded the administration of justice with respect to the investigation of the instant offense of conviction, an increase of 2 levels is warranted pursuant to U.S.S.G. § 3C1.1. (PSR ¶ 59).

- Because the defendant accepted responsibility through the entry of his guilty plea, his offense level is decreased by a total of 3 levels pursuant to U.S.S.G. §§ 3E1.1(a) and 3E1.1(b). (PSR ¶¶ 61-62).

- Because the defendant meets the criteria set forth in U.S.S.G. §§ 4C1.1(a)(1)-(10), and is therefore a zero-point offender, the offense level is further reduced by two levels. (PSR ¶ 63).

Accordingly, the applicable Guidelines offense level is 41. (PSR ¶ 64).

The defendant has no known prior convictions, and his Criminal History Category is I. (PSR ¶¶ 67-68). Based upon the calculations set forth above, the Guidelines sentence applicable to the defendant's offenses is greater than the statutorily authorized maximum sentence, and therefore pursuant to U.S.S.G. §§ 5G1.1(a) & 5G1.2(d), the applicable Guidelines sentence is the statutorily authorized maximum sentence of 120 months' imprisonment.

### B.    The Defense Objection to Loss Amount

The defendant contests the loss amount calculation set forth above. However, in pleading guilty, the defendant stipulated that, as a factual matter, investors in the Allianz Global U.S. funds lost approximately $3,238,748,199.69, and that his former employer paid that amount to victims as restitution to compensate them for their losses. *See United States v. Allianz Global Investors U.S. LLC*, 22 Cir. 279 (CM). That amount, which reflected the lost principal amount of victims' investments, is the correct amount of "loss" under U.S.S.G. § 2B1.1(b)(1). Arguing otherwise, the defendant relies on inapplicable loss calculation principles from publicly traded stock fraud cases to contend that the loss amount here is "zero." Those cases have no application in an investment adviser fraud case, as proven by the absurd "zero loss" result the defendant's proposed methodology yields. Because the victims' lost principal—the amount they have been compensated as restitution—is a reasonable estimate of the losses, the loss amount in this case is correctly counted as exceeding $550 million.

Even if the defendant were right that victims' losses cannot be computed because of the "extreme market turmoil" caused by the COVID-19 pandemic—a proposition the Government disagrees with—that does not mean that the amount of loss is therefore zero. Rather, the Guidelines commentary instructs that when loss "reasonably cannot be determined," it is appropriate to use the defendant's "gain that resulted from the offense." U.S.S.G. § 2B1.1(b)(1), comment. n.3(B). Here, with his plea the defendant admitted the forfeiture allegations in the Superseding Information and agreed that his gain was $17,577,908. Under U.S.S.G. § 2B1.1(b)(1)(K), that gain means that the defendant's offense level should be increased at least 20 levels, resulting in a Guidelines range

of 108 to 120 months, which, at the upper bound, is the same as the range set forth in the plea agreement.

Accordingly, the defendant's argument that the loss amount under U.S.S.G. § 2B1.1(b)(1) is "zero" should be rejected.

1.    Applicable Law on Loss Amount

The Guidelines provide for an enhancement in fraud cases based on the amount of "loss," which is the greater amount of either the "actual loss" or "intended loss." U.S.S.G. § 2B1.1(b)(1), comment. n.3(A)(i). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense," whereas "intended loss" is the "pecuniary harm that the defendant purposely sought to inflict." *Id*. Reasonably foreseeable pecuniary harm means monetary harm "that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.*, comment n.3(A)(iii)-(iv).

The Guidelines "do not present a single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and individualized nature of the inquiry." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007). Thus, in determining the amount of loss involved under U.S.S.G. § 2B1.1(b)(1), a court "'need only make a *reasonable estimate* of the loss' resulting from the defendant's crime." *United States v. Abiodun*, 536 F.3d 162, 167 (2d Cir. 2008) (quoting U.S.S.G. § 2B1.1, cmt. n. 3(C)) (emphasis in *Abiodun*); *see also United States v. Coppola*, 671 F.3d 220, 250 (2d Cir. 2012) (evidence supporting a Guidelines loss determination "need not . . . establish loss with absolute precision; it need only permit the district court to make a reasonable estimate of the loss given the available information").

"[I]n investment fraud cases such as this one, where a defendant fraudulently induces victims to invest, courts have found an appropriate measure of loss to be the amount that the defendant induced the victims to invest, less anything the victims received in return." *United States v. Barbera*, No. 21 Cr. 154 (JGK), 2023 WL 6095026, at *2 (S.D.N.Y. Sept. 18, 2023) (citing *United States v. Hsu*, 669 F.3d 112, 121 (2d Cir. 2012), *United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009), and *United States v. Stitsky*, 536 F. App'x 98, 112 (2d Cir. 2013)). Such a measure is appropriate where the defendant "obtained [victims'] investments by misrepresenting the fund structure in which they would be investing," and the victims "did not intend to take on the risks and benefits of the market associated with [such an] investment," because the victims' losses are "caused not by the decline in value of [the company's] funds, but by their having invested in the first place." *United States v. Bryson*, 101 F. Supp. 3d 147, 155-56 (D. Conn. 2015) (citing *United States v. Paul*, 634 F.3d 668, 677-78 (2d Cir. 2011), and *Stitsky*, 536 F. App'x at 112).

2.    Discussion of Loss Amount

Here, the defendant—who was at relevant times an investment advisor and a fiduciary to his AGI's clients—pled guilty to fraudulently inducing investors to invest with AGI based on false and misleading statements that substantially understated the risks being taken by the defendant and

his co-conspirators. (PSR ¶¶ 18-30). Had there been a trial, victim witnesses would have testified that representations by the defendant and his co-conspirators about the relative riskiness of the funds, and the existence of risk management strategies as represented by the defendant and his co-conspirators, were material to their investment decisions. Because the structure of the Funds and their risk mitigation strategies were material to investors, and the defendant "obtained [victims'] investments by misrepresenting the fund structure in which they would be investing," the victims' losses were caused by "having invested in the first place." *Bryson*, 101 F. Supp. 3d at 155-56. Indeed, the Second Circuit has repeatedly emphasized, "[t]he guidelines provide that when an investor puts money into a fraudster's hands, and ultimately receives nothing of value in return, his loss is measured by the amount of principal invested[.]" *Hsu*, 669 F.3d at 121; *see also United States v. Balboa*, 622 F. App'x 31, 32 (2d Cir. 2015) (same); *Komar*, 529 F. App'x at 29 (the "loss" was "the money that the investors were fraudulently induced to invest"); *Stitsky*, 536 F. App'x at 110 (district court's calculation of loss based on the "total amount of money invested" by victims was "reasonable" under Second Circuit precedents).

The defendant does not dispute that victims lost $3,238,748,199.69, and that that amount reflects the victims' lost principal, but disputes that lost principal is an appropriate measure of loss. Each of the defendant's arguments are legally unsupported and have been previously rejected.

First, the defendant argues that the measure of loss set forth in *Hsu* and *Balboa* is limited to cases involving Ponzi schemes where what the victim investors got was "worthless." (Dkt. 158 at 29). But the opposite is true. *Hsu* held that despite the general legal principle that the measure of loss is the "principal invested," in the Ponzi scheme context the district court may *also* consider promised interest or return when an investor has been fraudulent induced to reinvest. And despite the fact that *Balboa*, *Barbera*, and *Bryson* were not Ponzi scheme cases, they nonetheless relied on *Hsu* for the proposition that the invested principal is an appropriate measure of loss in an investment fraud case. *See Balboa*, 622 F. App'x at 32 (applying the lost principal measure to securities mismarking); *Barbera*, 2023 WL 6095026, at *2 (applying the lost principal measure to false statements made to investors in private company); *Bryson*, 101 F. Supp. 3d at 155-56 (applying the lost principal measure to false statements to investors about a fund's investment strategy). Additionally, with respect to the defendant's claim that investments were always "worthless," what matters is not whether the investments were always valueless, but the investments' value at the time the fraud was uncovered—here, zero, just as in *Stitsky*. *See Stitsky*, 536 F. App'x at 110 (district court reasonably relied on the total amount of money invested by the victims to estimate loss). Where, as here, victims "are left with nothing of value when the fraud was uncovered," loss amount is properly measured based on the victims' total investment. *Byors*, 586 F.3d at 226.[2]

---

[2] The defendant also cites the sentencing transcript from *United States v. Lumiere*, No. 16 Cr. 483 (S.D.N.Y. June 13, 2017), Dkt. No. 105. But that decision neither rejected lost principal as a measure of loss, nor did it endorse the test proposed by the defendant. In *Lumiere*, Judge Rakoff expressed that he was "not inclined" to adopt the Government's "loss calculation" because it did not account for the fact that "what they got was not worthless." *Id.* Notably, Judge Rakoff did not apply the loss measure urged by the defendant here. Instead, he said he was inclined to use

Second, citing *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007), the defendant argues that the Government must prove that "the misrepresentation proximately caused the economic loss." (Dkt. 158 at 26). In *Rutkoske*, a stock manipulation case, the district court had calculated the loss amount by taking "the losses sustained by … customers … as a result of their purchases and sales between January 1997 and July 29, 1999," despite the fact that the date July 29, 1999 "had no particular relevance to the offense conduct, and in fact was three months after the end of the charged conspiracy." *Rutkoske*, 506 F.3d at 178. Noting that "other factors [besides fraud], such as changed economic conditions, might also contribute to a stock's decline in price," the Second Circuit held that the district court's "basic failure at least to approximate the amount of the loss caused by the fraud without even considering other factors relevant to a decline in … share price" required remand. *Id.* at 179-80.

But *Rutkoske* and the other case on which the defendant relies, *United States v. Olis*, 429 F.3d 540, 545-46 (5th Cir. 2005), an accounting fraud, both concerned losses that stemmed from schemes inflating the value of a publicly traded stock. Thus in *Rutkoske*, the losses were the amount the shares' value was inflated as a result of the manipulation, and in *Olis*, the losses were the amount the company's shares were overvalued based on fraudulent recorded revenue. There, it was appropriate to determine whether a stock crash was a result of the fraud being revealed, or caused by other market factors. But here, the fraud was in the inducement to entrust the defendant and his coconspirators with money to manage; it did not relate to misrepresentation concerning the value of securities. The measure of loss is therefore different.

There is another problem with the analogy to *Rutkoske* and *Olis*: there the fraud was revealed, which resulted in the devaluation of publicly traded securities, and the question was how much of that devaluation was the result of the stock being overvalued. In a case like *Rutkoske* it is possible to do an event study to determine how much of stock losses are attributable to the public disclosure of fraud. But here, the order is reversed. The stock market crashed, which ultimately revealed that the defendant and others had been perpetrating a fraud. Unlike in *Rutkoske* and *Olis*, the losses at AGI are not a good proxy for losses attributable to the fraud because the fraud had not yet been revealed when the losses occurred. There was no disclosure date, from which resulting losses can be observed. The causation method urged by the defendant does not work because the causal order is reversed.

The defendant asserts that other conditions contributed to AGI's losses, most notably market turmoil from COVID-19. Without conceding the correctness of the analysis of Israel Nelken—whose data sets and methodologies have not been the subject of disclosure, testing, or *Daubert* review—the question of whether AGI's losses were caused by COVID-19 is legally

intended loss or gain as the measure of loss, but wanted to hear from the Government. *Id.* Ultimately, however, the court did not rule on whether lost principal was an appropriate measure of loss because the Government had learned that "there had been some recoveries" and therefore it was not "confident in those loss numbers." *Id.* With the agreement of the Government, Judge Rakoff relied on the gain calculation.

irrelevant. As the Second Circuit has repeatedly held, the argument that "the global economic downturn, rather than [a] fraudulent scheme, was the ultimate cause of the victims' loss and therefore, the actual loss attributable to the fraud was $0" has been "foreclosed" by past precedents. *Balboa*, 622 F. App'x at 32 (collecting cases); *see also Paul*, 634 F.3d at 677 ("the loss ... was not caused by the decline in value of SLM stock, but rather, by the making of the loans in the first instance."). Simply put, if the defendant had not fraudulently induced investors to invest with AGI, they would not have been exposed to the market risks of those investments. *See Stitsky*, 536 F. App'x at 110 (no offset warranted for "losses resulting from changed economic circumstances because ... investors would not have been exposed to such risks had defendants not fraudulently induced them to invest in the first place"); *Barbera*, 2023 WL 6095026, at *3 (same).

In any event, using a lost principal method for determining loss is at least a "reasonable estimate" of loss, which is all the Guidelines require. *Abiodun*, 536 F.3d at 167. The lost principal method yields an outcome consistent with the fact that AGI's victims believed they victimized in an amount at least equal to their lost principal. And AGI itself determined that those investors were entitled to recoup their lost principal as restitution. The legal propriety of the method is also confirmed by the fact that since *Rutkoske* the Second Circuit has repeatedly affirmed the use of the lost principal method for quantifying loss, as discussed above. On the other hand, the method proposed by the defendant is not a reasonable estimate of losses here. The notion that the loss amount is zero, even though the appropriate restitution amount—which the defendant agreed to— is in excess of $3.2 billion does not comport with common sense, and illustrates the fact that the method used in *Rutkoske* is ill-suited for cases where the fraud did not involve a manipulation or inflation of a publicly-traded stock.

Third, the defendant argues that even if lost principal is an appropriate measure of loss, the loss was not foreseeable because the defendant did not foresee the future losses from the COVID-19 market downturn. (Dkt. 158 at 34.) But the Guidelines provide that reasonably foreseeable pecuniary harm is monetary harm that the defendant knew or should have known "was a *potential result* of the offense." U.S.S.G. § 2B1.1(b)(1), comment. n.3(A). Here, it was plainly foreseeable to the defendant that by taking risks that were concealed from investors, including by not paying for certain hedges against potential losses, losses could result to the investors. As the court explained in *Bryson*, quoting the Second Circuit in *Turk*, "a potential direct result of defendant's specific fraudulent act was the total loss of the moneys the individual investors had given" and such a possibility is "enough to constitute reasonably foreseeable pecuniary harm." *Bryson*, 101 F. Supp. 3d at 156 (quoting *Turk*, 626 F.3d at 750). There is no requirement that the defendant had to anticipate investors losing everything as a result of COVID-19, and the defendant has cited to no such authority. As long as the losses were a "potential result" of the deception, that is sufficient. *United States v. Frenkel*, 682 F. App'x 20, 23 (2d Cir. 2017).

Finally, even if the defendant was correct that loss cannot be measured by the amount of lost principal, it does not follow that the loss was therefore zero. Just because the defendant's expert did not conclude that there were losses caused by the defendant's criminal conduct, that does not mean that the losses were not caused by such conduct. It just means that such losses could not be disaggregated from the losses stemming from COVID-19. The method proposed by the

defendant is poorly suited for a case involving fraudulent inducement of investors to invest in private funds. Were the Court to find that a loss amount cannot be reasonably determined through the loss of principal, the Court may consider the defendant's gain. U.S.S.G. § 2B1.1 cmt. n. 3(B). Because the defendant agreed to forfeit $17,577,908 as proceeds of the offense, under U.S.S.G. § 2B1.1(b)(1)(K), his offense level should be increased at least 20 levels were the Court to use "gain" as an alternative to loss. Thus, even if the Court were to use the defendant's gain as an alternative to loss, the defendant's total offense level would be 31. That results in Guidelines sentence that encompasses the statutory maximum of 120 months' imprisonment.

Accordingly, while the victims' lost principal is an appropriate measure of loss here, the Court may conclude that the applicable Guidelines are 108 to 120 months' – or just 120 months' – imprisonment, and that the disputed loss calculation does not affect the sentence it intends to impose.

## C. This Court Should Impose a Substantial Term of Imprisonment

The Government respectfully submits that this Court should impose a substantial term of imprisonment of no fewer than seven years' imprisonment, which is in the heartland of sentences recently imposed within this District for similar conduct. Tournant was a fiduciary, entrusted with the responsibility to manage other peoples' savings, including pension funds for teachers, clergy, bus drivers, engineers and others. For years, Tournant systematically abused that trust giving his clients misleading information about the riskiness of his investment practice, depriving those clients of the ability to make fully informed decisions about how to manage their investments, all while reaping higher performance fees from his risk taking. Investors did not learn of Tournant's fraud until too late—after the crash of the Structured Alpha Funds wiped out over $3.2 billion of investor principal early in the COVID-19 pandemic.

### 1. The Nature and Circumstances of the Offense Warrant a Substantial Term of Imprisonment.

Tournant committed a serious, long-term offense in which he repeatedly abused his clients' trust. When Tournant was supposed to be a trusted advisor, he instead took extraordinary steps to deceive those he was supposed to advise, reaping significant performance fees in the process. That criminal abuse of trust warrants a substantial term of imprisonment.

The significance of Tournant's crime lies, in large part, in his role as an investment advisor. An investment advisor is supposed to act as a fiduciary, managing investments in their clients' best interests and disclosing to clients material information about how the investment advisor plans to go about that task. This special, trusted status is, in part, what helped Tournant convince pension funds and other conservative investors to rely on him to manage vast sums of money on their behalf. Indeed, Tournant leaned into that perception, telling some investors that he and others running the Structured Alpha Funds considered themselves "risk managers first, return managers second," and touting the oversight Allianz exercised over the funds, calling the company a "master cop" that was "monitoring every position that I take to make sure that from

legal, compliance, and risk standpoint . . . I 'm well within the guidelines." PSR ¶¶ 21, 33. These remarks show Tournant's understanding that it was important for many of his clients to feel they were investing with someone they could trust to appropriately manage risk and act in their best financial interests.

Despite these representations, and with full knowledge of his special, trusted status, Tournant for years deceived his clients about the risks he was taking with their investments. The defense is wrong to characterize Tournant's crime as a few edits to a handful documents that went to only a subset of investors. Rather, Tournant's repeated decisions to falsify a wide array of documents evinced a long-running desire on the part of Tournant and his co-conspirators to keep investors in the Structured Alpha Funds from accurately understanding the risk at which Tournant was placing their investments.

Tournant's pernicious scheme is most starkly apparent in his lies to the Structured Alpha Funds' largest investor ("Investor-1"). In 2016, Investor-1 agreed to invest through a specialized strategy known as the Variable Alpha Funds. A significant point of this specialized strategy was risk management: The idea was that—rather than having a consistent "alpha" target (that is, the target for performance above return from a passive index—the alpha target would be lower in low-volatility situations and higher in high-volatility situations, to help reduce Investor-1's exposure to the risk of loss. *Id.* Tournant, however, disregarded these constraints and lied to cover it up. He regularly managed the Variable Alpha Fund to higher alpha targets tan the strategy called for, exposing Investor-1 to greater risk than it anticipated. Tournant then hid that fact by giving Investor-1 fraudulent reports that showed the Variable Alpha Funds being managed to a lower alpha target than was in fact the case. This prevented Investor-1 from accurately understanding how Tournant was managing its money and the risks to it was exposed. *See* PSR ¶ 32.

The fraud on Investor-1 is a perfect encapsulation of the severity of Tournant's crime. He gained the trust of an investor interested in managing its risk. He disregarded that relationship of trust by managing the investment outside the agreed-upon guidelines. Then he lied to the investor to hide the fact that he was taking on more risk than the investor expected or desired. This crime deprived Investor-1 of the ability to decide how to manage its investments. At bottom, Tournant disarmed Investor-1 by taking on the mantle of the fiduciary, then lied to prevent Investor-1 from being able to protect itself from the risk Tournant wanted to take.

The other methods Tournant used to commit his fraud are variations on this same, fundamentally criminal theme. Start with hedging. Tournant and his co-conspirators consistently gave presentations to actual and prospective investors, representing that they planned to purchase hedges for the Structured Alpha Funds that ranged from -10 to -25% out of the money. The placement of those hedges was important to investors because the hedges served as protection against a short-term market crash, so investors would not suffer significant losses while the Structured Alpha Funds took time to adjust. But as with the alpha target on the Variable Alpha Funds, those representations about hedges were misleading. In reality, Tournant and his co-conspirators were purchasing hedges further out of the money, including hedges that averaged between -30 to -50% out of the money in February 2018. These hedges were less expensive—

allowing Tournant and his co-conspirators to bolster performance by skimping on hedge costs—but they also offered less protection than represented in a sharp market downturn.  PSR ¶ 24.

Once again, Tournant covered up this increased risk by falsifying reports that might tip investors off to the issue.  He and a co-conspirator manually altered open position worksheets before investor meetings, to make it look like the hedges were within strike distances of -10 to -25% out of the money, when that was not actually the case.  PSR ¶ 25.  Tournant and a co-conspirator also manually altered data about the holdings of the Structured Alpha Funds, to make it seem that there were hedges than those funds actually held.  PSR ¶ 26.  These were not just isolated revisions to a few documents.  As with the Variable Alpha Fund fraud, Tournant and his co-conspirators were falsifying reports to prevent their investors from having an accurate picture of the risks to their investments, which were materially different than those investors expected.

Tournant's scheme to deceive investors about the risks he was taking with their money extended to numerous other reports he falsified.  Most pervasively, Tournant and his co-conspirators opportunistically altered risk reports to hide exposure that the Structured Alpha Funds faced to significant losses.  Every day, an independent group within Allianz produced risk reports designed to show how the Structured Alpha Funds would fare under various stress tests.  Six investors and four consultants advising another 35 investors asked to see those reports, believing that the reports reflected an analysis conducted by an independent group within Allianz.  Unbeknownst to those investors, Tournant and his co-conspirators fraudulently altered over 75 of the reports, often arbitrarily shrinking the losses that those reports showed the funds would suffer in the event of a significant market downturn.  Tournant and his co-conspirators made similar, fraudulent alterations to other reports that investors requested to assess risk, including reports about the Greeks on the Structured Alpha Funds, the daily performance of certain funds, and the expected-value sheets Tournant and his co-conspirators displayed to investors.  PSR ¶¶ 27-31.

Properly understanding the severity of Tournant's crime requires looking at these data alterations as a cohesive whole.  This was not a one-off, spur-of-the-moment change to a document that could be chalked up to bad judgment.  Tournant and his co-conspirators engaged in a long-term, considered effort to deceive investors about the way they were managing money for those investors, concealing meaningful risks.  Each document they altered or report they falsified was part of the same, overarching scheme to make sure investors—who trusted Tournant and his co-conspirators as fiduciaries—would not have an accurate picture of the risks they were taking.

Tournant had a financial motive for this scheme, and he profited handsomely from it.  He and his co-conspirators did not earn money from a traditional management fee.  Instead, they made money based on the extent to which the Structured Alpha Fund's returns exceeded the relevant benchmark each quarter.  By taking on greater risks than they disclosed to investors, Tournant and his co-conspirators increased the chances that they would significantly outperform the benchmark and receive a substantial performance fee.  Similarly, paying less money for hedges reduced the costs of running the Structured Alpha Funds, also adding to the performance.  Of course, running the Structured Alpha Funds in a riskier manner also increased the chances of a significant loss.

But for a time, Tournant's bet paid off. In 2019 alone, he received approximately $13 million in total compensation, driven in large part by the performance fee. PSR ¶ 22.

That run of success ended catastrophically when the COVID-19 pandemic struck in early 2020. The Structured Alpha Funds suffered massive losses during the early weeks of the pandemic, and investors ultimately lost over $3.2 billion of principal they had invested in the funds. PSR ¶ 40. The defense vigorously contests the extent to which that loss was connected to the types of misrepresentations Tournant made to investors, as opposed to the way members of the Structured Alpha Fund responded to the market stresses posed by the pandemic. But when assessing Tournant's culpability, and the severity of his crime, parsing where to assign each dollar of loss is not the right exercise.

What matters is that Tournant and his co-conspirators coaxed investors into trusting them with billions of dollars by, in part, deceiving those investors about the extent to which their money was protected from sharp, short-term market downturns. The COVID-19 pandemic caused a sharp, short-term market downturn, and those investors suffered tremendously. If Tournant and his co-conspirators had been honest about the risks they were taking earlier, their investors could have decided to take their money elsewhere, pushed for Tournant to take fewer risks, or at a minimum asked meaningful follow-up questions to ensure they were comfortable with how Tournant and his co-conspirators were operating. But Tournant's clients were deprived of that chance to protect themselves because he tricked them into believing he was acting as an honest fiduciary, when instead he was taking repeated, brazen steps to keep them from learning the truth about how he was managing their money. That serious crime demands a substantial punishment.

## 2. A Substantial Term of Imprisonment is Necessary for General Deterrence and to Promote Respect for the Law.

A substantial term of imprisonment is also necessary to deter others from engaging in similar acts of criminal deception and to promote respect for the law. That is particularly true in light of Tournant's obstructive conduct following the collapse of the Structured Alpha Funds.

In enacting Section 3553(a), "Congress viewed deterrence as 'particularly important I the area of white-collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). General deterrence is a particularly important sentencing factor in fraud and other white-collar cases because the decision to commit those crimes is often a calculated cost-benefit decision. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."). As Judge Posner observed, "[c]onsiderations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994); *see United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (citing *Heffernan*).

The importance of general deterrence is particularly pronounced in the context of investment-advisor fraud of the type Tournant committed. A key feature of an investment-advisor relationship is that the client trusts the advisor to manage funds as a fiduciary. In so doing, the investors not only relinquish a significant degree of control over the day-to-day use of their money, but also put themselves at a significant information disadvantage compared to the investment advisor. Investors typically do not have insight into or closely monitor specific positions in the investment-advisor's portfolio, but instead rely on the investment advisor to provide accurate reports that summarize important performance and risk metrics. This case is a good example: Tournant managed money for large, sophisticated investors, but those investors did not routinely see the actual positions in his portfolio. Rather, they relied on Tournant to provide accurate reports on metrics that were relevant to their investment decisions.

Because investors give fiduciaries such significant authority, and trust those fiduciaries to provide accurate reporting, investment-advisor schemes are exceptionally difficult to detect and punish. The law encourages investors to trust their advisors, making them less on guard for potential fraud than they may be when dealing with an arms'-length counterparty. And investors typically lack the information to evaluate whether their investment advisors are giving them accurate reports. As a result, investment-advisor fraud typically comes to light only if someone with knowledge of the scheme blows the whistle, or if the investment suffers some significant loss that would prompt an investor to peel back the layers of what their advisor has been doing. All of this adds up to a category of crime that is difficult to detect and prosecute effectively.

Investment-advisor fraud is also lucrative. Many investment advisors have fee structures tied to certain performance metrics. This creates a strong financial incentive to hit those numbers, either by falsifying performance information or, in Tournant's case, managing investments in a way that is more likely to result in a significant fee, even if that approach is not in line with investor expectations. These strong financial incentives, coupled with the difficult of detecting investment-advisor fraud, make the crime a tempting one for unscrupulous fund managers.

Here, a substantial term of imprisonment is necessary to ensure that others in Tournant's position ensure that there will be serious consequences for defrauding those who trust them with their money. The collapse of the Structured Alpha Funds was highly publicized, and Allianz has made substantial payments to compensate investors for Tournant's crime. Should Tournant receive a non-incarceratory sentence, as he suggests, financial professionals may be emboldened to engage in similar crimes, believing that such schemes are hard to detect and, even if they are detected, are unlikely to result in significant repercussions. *See United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("It is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars from his company by the threat of a purely probational sentence."). A sentence without jail time would also threaten to erode the confidence that investors place in their investment advisors. The securities laws encourage investors to trust those advisors as fiduciaries and to enforce that protection, there need to be meaningful consequences for advisors who defraud their clients.

Tournant's conduct after the collapse of the Structured Alpha Funds also heightens the need for a term of imprisonment. In the aftermath of that collapse, Allianz and the SEC began investigating whether Tournant and his co-conspirators had falsified risk reports that they sent to investors. Tournant and his co-conspirators attempted to frustrate that investigation by making the misleading claim that they had altered risk reports to make them more accurate—concealing that they had altered many reports to fraudulently make the Structured Alpha Funds appear like they would suffer fewer losses in the event of a downturn than was actually the case. This attempt to hide the crime shows just how difficult it is to detect investment-advisor fraud, particularly in the context of complicated portfolios like those at the Structured Alpha Funds. It also underscores why it is appropriate to impose a meaningful sentence in this case to promote general deterrence and respect for the law, given Tournant's efforts to hide his wrongdoing even after the Structured Alpha Funds imploded.

### 3. A Substantial Term of Imprisonment is Necessary to Ensure Consistency with Other, Similar Cases.

Finally, the Government does not contest that a downward variance is warranted in light of Tournant's health problems, and the recommendation in this submission reflects that consideration. Nonetheless, a sentence of time served, as the defense requests, would not only be inappropriate in light of the severity of Tournant's crime and the need for general deterrence, but also would introduce unfair sentencing disparities between Tournant and other defendants who have committed similar crimes.

These health issues merit serious consideration and a downward variance, but adopting the defense's request to vary to time served would create an unjust difference between Tournant and other defendants who have been sentenced for similar conduct. Courts in this District have consistently imposed significant sentences for investment advisors who misled clients about performance or risk, particularly in cases involving defendants who, like Tournant, managed significant sums of money and made misrepresentations over an extended period of time.

---

[3] Defense counsel previously sent the Government a letter and medical records with information about Tournant's health issues. The Government has provided those materials to the Bureau of Prisons, so the Bureau of Prisons can assess its ability to care for Tournant.

The most comparable case is Judge Cote's recent sentencing decision in *United States v. Velissaris*, 22 Cr. 105 (DLC).  The defendant, James Velissaris, managed over $3 billion of investor money in funds that traded, among other thing, over-the-counter derivatives.  Just as Tournant made misrepresentations to clients about the risks he was taking with their money and the process Allianz had for independently supervising that risk, Velissaris lied about the performance of his investments and the process for valuing them.  Specifically, Velissaris represented investors that his investment funds used a third-party group to value the derivatives he purchased, when in reality Velissaris played an active role in altering valuations to make inflate the apparent performance of his investments.  When that mismarking practice came to light, Velissaris's funds were forced to liquidate many of the investments for hundreds of millions of dollars less than the value Velissaris had reported to investors.  Judge Cote ultimately sentenced Velisarris to 15 years' imprisonment.

Judges have also imposed substantial prison sentences in other cases where investment advisors defrauded clients about performance or risk, even in cases involving substantially smaller investor harm than the Structured Alpha Funds caused.  For example, in *United States v. Hu*, 20 Cr. 360 (AKH), Judge Hellerstein sentenced an investment advisor to 12 years' imprisonment for a scheme that involved overvaluing and falsifying information about loans that he traded on behalf of his clients.  In *United States v. Tagliaferri*, 13 Cr. 115 (RA), Judge Abrams imposed a six year sentence on an investment advisor who engaged in a scheme that involved misleading investors about the nature of his investments and certain fees he received.  In *United States v. Shor & Ahuja*, Judge Failla sentenced executives of a hedge fund to 40 and 50 months' imprisonment for fraudulently overstating the value of certain assets to deceive investors about the performance of their strategy.[4]  And in *United States v. Lumiere*, 16 Cr. 483 (JSR), Judge Rakoff sentenced a portfolio manager to 18 months' imprisonment for fraudulently inflating the performance of the fund he managed, so he could claim higher performance fees.

Were it not for Tournant's health issues, the sentences in these other cases would have counseled in favor of a Guidelines sentence of 10 years' imprisonment.  Tournant committed a long-running fraud to deceive his clients about how he was managing risk, which involved numerous instances of brazenly falsifying records to keep those clients in the dark.  That fraud left investors who entrusted Tournant with billions of dollars unable to protect themselves until it was too late and those billions were lost.  Tournant's reaction was not contrition, but to try to keep hiding from Allianz and the SEC by working with his co-conspirators to pretend that they revised reports to make them more accurate, rather than to falsify them.  And even now, the defense's sentencing submissions heavily downplay the nature of the crime, characterizing it as a few minor tweaks to documents that investors should not have asked for in the first place.

The Government recognizes that, because of his health issues, Tournant's time in prison may be more difficult than it is for others, and because of that recommends a significant downward

---

[4] The sentences were later vacated and the defendants were resentenced to a stipulated term of time served.

variance.  A sentence of fewer than seven years' imprisonment, however, would be too large a reduction from the Guidelines range to adequately account for the severity of Tournant's conduct and the need to appropriately, and fairly, punish investment advisors who deceive those who trust them.

## V.    <u>CONCLUSION</u>

For the reasons discussed above, the Government respectfully submits that a sentence of no fewer than seven years' imprisonment is sufficient, but not greater than necessary, to achieve the legitimate ends of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

_____/s/_____
Thomas Burnett
Sarah Mortazavi
Nicolas Roos
Assistant United States Attorneys
(212) 637-1064/2520/2421